**NEW DESIGN CONSTRUCTION COMPANY, INC., a Colorado corporation, Plaintiff–Appellee and Cross–Appellant,**

v.

**HAMON CONTRACTORS, INC., a Colorado corporation, and United States Fidelity and Guaranty Company, a foreign corporation, Defendants–Appellants and Cross–Appellees.**

**No. 06CA2011.**

Colorado Court of Appeals,
Div. II.

June 26, 2008.

Berg Hill Greenleaf & Ruscitti, LLP, Daniel M. Gross, Heidi C. Potter, Boulder, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Benson & Associates, P.C., Jesse Howard Witt, Golden, Colorado, for Defendant–Appellant and Cross–Appellee Hamon Contractors, Inc.

Milo D. Miller, III, Denver, Colorado, for Defendant–Appellant and Cross–Appellee United States Fidelity and Guaranty Company.

Opinion by Judge TAUBMAN.

In this breach of construction contract case, the general contractor, Hamon Contractors, Inc., and its surety, United States Fidelity and Guaranty Company (USF & G) (collectively Hamon), appeal from the trial court's judgment in favor of New Design Construction Company, Inc. (NDCC), concerning two projects to expand the interchange of Interstate 270 and Interstate 76 in Adams County. NDCC cross-appeals the trial court's order denying its request for attorney fees under Colorado's frivolous and groundless attorney fee statute. We affirm in part, reverse in part, and remand for further proceedings.

## I. Background

This case concerns two highway projects authorized by the Colorado Department of Transportation (CDOT) for paving and other improvements. After CDOT accepted Hamon's bid for the two projects, Hamon entered into the first contract, called Phase 2/3, in 2000 and entered into the second project, Phase 4, in 2001. Hamon was CDOT's general contractor, and NDCC was Hamon's paving subcontractor.

Although Phase 2/3 was scheduled to commence in October 2000, it did not begin until about six months later. Phase 2/3 included concrete paving, construction of five new bridges, the widening and replacement of roadways and ramps, and other infrastructure improvements. Phase 4 included two bridges and concrete paving.

As relevant here, each subcontract between Hamon and NDCC incorporated all terms of the pertinent prime contract between CDOT and Hamon. Under the prime contract, CDOT required Hamon to develop a critical path method schedule and a phasing plan to describe the sequential work on the projects. Although Hamon's initial phasing plan contemplated that it would build the five bridges for Phase 2/3 sequentially, it later altered its plan so that it would work on all five bridges simultaneously. Hamon did not inform NDCC of this resequencing.

Between 2001 and the completion of the projects in September 2003, Hamon and NDCC engaged in frequent disputes, with NDCC asserting that it had not been adequately advised of Hamon's schedule changes and that it was directed to make shorter and shorter roadway paving "pours." Hamon, in turn, asserted that NDCC had provided substandard paving that required significant time to remediate.

Notwithstanding these disputes, CDOT accepted both the Phase 2/3 and Phase 4 projects in early September 2003. Because the dates of acceptance of these projects were several days beyond the adjusted completion date, CDOT assessed Hamon liquidated damages. Although CDOT made its final Phase 2/3 project payment to Hamon in December 2003, it withheld payment on the Phase 4

project because NDCC had filed a claim with CDOT.

After settlement discussions to resolve their disputes proved unsuccessful, NDCC filed this action in February 2004 alleging, as relevant here, claims for breach of contract against Hamon, violation of Colorado's prompt payment statute against Hamon, and a request for payment under statutory payment bonds against Hamon and USF & G.

Hamon moved to dismiss the lawsuit based on lack of subject matter jurisdiction, asserting that NDCC had failed to exhaust administrative remedies as required by a provision in the subcontracts. Although the trial court initially agreed and stayed proceedings in the case, it subsequently concluded, after NDCC abandoned its administrative claims against CDOT concerning Phase 2/3, that the case could proceed without exhaustion of administrative remedies.

Following a three-week bench trial in late 2005 and January 2006, the trial court entered a thorough, thirty-six-page written judgment, ruling largely in favor of NDCC on its breach of contract and prompt payment claims, and holding USF & G liable under its payment bond. With respect to NDCC's prompt payment claim, the court determined that Hamon acted in bad faith when it, inter alia, withheld the entire subcontract balance. The court also concluded that "the single most significant factor contributing to the problem on these Projects was Hamon's decision to resequence the phases of the Projects, particularly the phases on the 2/3 Project, and its failure to incorporate that resequencing into the critical path scheduling."

On July 7, 2006, the trial court entered a final judgment, awarding NDCC net damages of $990,539.89 plus prejudgment penalty interest through April 7, 2006, in the amount of $429,360.60, for a total of $1,419,900.49, plus postjudgment penalty interest from April 8, 2006 at the rate of fifteen percent.

The total judgment amount was divided as follows:

Phase 2/3

| | |
|---|---|
| Balance of subcontract price: | $773,179.11 |
| Plus allowed extras: | 27,590.38 |
| Less allowed back-charges | [30,530.45] |
| Less 20% of liquidated damages | [ 7,308.00] |
| Project 2/3 Total: | $762,931.04 |

Phase 4

| | |
|---|---|
| Balance of subcontract price: | $223,385.44 |
| Plus allowed extras: | 6,000.00 |
| Less allowed back-charges: | -0- |
| Less 10% of liquidated damages: | [1,776.59] |
| Project 4 Total | $227,608.85 |
| | |
| Total (both Projects) | $990,539.89 |
| Prejudgment penalty interest (15%) | $429,360.60 |
| Grand total | $1,419,900.49 |

+ 15% postjudgment penalty interest

Additionally, the trial court denied NDCC's request for attorney fees against Hamon and USF & G, concluding that the defenses and counterclaims of Hamon and USF & G did not lack substantial justification within the meaning of section 13–17–102, C.R.S.2007.

This appeal followed.

## II. Exhaustion of Administrative Remedies

Hamon asserts that the trial court erred in denying its motions to dismiss and motions for directed verdict on the basis that NDCC had not exhausted its administrative remedies, and, therefore, the trial court lacked subject matter jurisdiction. NDCC responds that the administrative law doctrine of exhaustion of administrative remedies is inapplicable here and that, under breach of contract principles, the trial court properly concluded that it was not required to pursue any administrative remedies with CDOT. We agree with NDCC.

At issue here is the meaning of Section 18 of the subcontracts, which describes a procedure for dispute resolution that refers to exhaustion of administrative remedies. Section 18 provides as follows:

Any dispute concerning this Subcontract shall be resolved initially through any claims process contained in the Contract Documents and as required of the Contractor by the Owner. In the event the parties cannot resolve their dispute through such claims process, the parties may agree, but shall not be required to submit same to arbitration pursuant to the rules and procedures of the American Ar-

bitration Association [Construction Industry Procedures], but only if the arbitrator agrees to apply the substantive law pertaining to the dispute and contractor consents to the appointment of any particular arbitrator. In any event, subcontractor[ ] shall be required to exhaust all administrative remedies available pursuant to the Contract Documents, prior to commencing either litigation or arbitration. In the event subcontractor fails to comply with the foregoing, subcontractor shall indemnify contractor for all costs, claims, damage and attorney fees arising from such noncompliance.

The parties agree that the reference in Section 18 to "any claims process contained in the Contract Documents" refers to CDOT's administrative review procedure.

During the course of this litigation, the trial court entered several orders relating to the issue of exhaustion of administrative remedies. In its order of August 2, 2004, the trial court agreed with Hamon that "this court lacks subject matter jurisdiction, at the moment, over [NDCC's] breach of contract claim because of the mandatory claims process provision set forth in the Subcontract." In that order, the trial court rejected NDCC's contention that the mandatory claims process provision applied only to "pass-through claims," that is, a subcontractor's claims against the general contractor which in effect are claims against CDOT, and found that NDCC no longer had any such claims. Nevertheless, the trial court further held that, if NDCC were to submit its breach of contract claim to the state's claim process, and the state were to refuse to entertain that claim because it was not directly or indirectly a claim against the state, the court would then entertain NDCC's argument that the claim should proceed to litigation notwithstanding the mandatory claims process provision. The court added, "But unless and until [NDCC] can demonstrate such futility, the parties to the contract are entitled to rely on the plain language they chose, and I am obligated to enforce it."

The trial court also rejected Hamon's characterization of the mandatory claims process as an administrative remedy subject to the exhaustion of administrative remedies doctrine. Rather, the trial court concluded, "I view the mandatory claims process provision of the Subcontract as a kind of mandatory arbitration provision, which two private parties have agreed to abide by, and which just happens to piggyback on the claims process in the Contract Document [between CDOT and Hamon]."

Finally, the court stayed NDCC's claims pending resolution of the breach of contract claim in the state's claim process.

Following the entry of this order, NDCC and CDOT, then a party to this litigation, entered into a stipulation regarding the order. The stipulation noted that NDCC and CDOT had resolved their disputes. The stipulation then provided as follows:

3. Under the terms of [CDOT] Special Provision 105.17, only claims for which CDOT is potentially responsible for payment may be submitted for resolution by CDOT. Section 105.17 contains certification requirements which require that the Contractor state, under penalty of law for perjury or falsification, that the amount of claim being submitted to CDOT for work under the CDOT contract is a true statement of the actual costs and time incurred, and that it is fully documented and supported under the Contract between the parties.... The purpose of the certification is to ensure that claims submitted to CDOT are accurate and properly supported under the CDOT Contract with the prime contractor.

4. The CDOT claims process that pertains to the phases 2/3 and 4 Contracts is not designed to, and does not and cannot resolve claims that are solely between the prime contractor and its subcontractor. The only claims which are subject to the CDOT dispute process are those that involve monies that are potentially the responsibility of CDOT. If any claim were ever submitted to CDOT, which was solely concerned with the rights of a subcontractor to recover against the prime contractor under a subcontract, CDOT would not entertain such a claim. However, claims between a subcontractor and prime contractor may also include claims against CDOT.

In such case, the CDOT claims may be submitted to CDOT pursuant to Section 105.17 procedures, but CDOT would not render any decisions about responsibility for claims between a CDOT contractor and its subcontractor.

5. CDOT does not have thorough or complete knowledge regarding the substance of the claims between Hamon and New Design since CDOT is not a party to these claims.

6. There are currently no pending claims against CDOT on either project involving New Design.

Three months later, the trial court lifted its earlier stay and again denied a motion to dismiss filed by Hamon and USF & G. The court did so for the reasons stated in its original order of August 2, 2004 but commented,

> I share some of the moving Defendants' concern that the futility of the arbitration required by the Subcontract may have been orchestrated by [NDCC]. Nevertheless, in the end I am satisfied that CDOT would have been unwilling to hear the arbitration quite apart from such orchestration, and therefore that the stay should now be lifted and [NDCC] should be permitted to pursue its claims in this court.

During and after the bench trial, the trial court denied Hamon's motions for directed verdict based on failure to exhaust administrative remedies.

### A. Subject Matter Jurisdiction

■ Hamon argues that the trial court erred in denying its motion to dismiss and motions for directed verdict based on lack of subject matter jurisdiction because NDCC did not exhaust its administrative remedies. We disagree.

Because Hamon asserts that this issue presents a question of subject matter jurisdiction, we review it de novo. *In re J.C.T.*, 176 P.3d 726, 729 (Colo.2007).

■ The doctrine of exhaustion of administrative remedies serves as a threshold to judicial review that requires parties in a civil action to pursue available statutory administrative remedies before filing suit in district court. *State v. Golden's Concrete Co.*, 962 P.2d 919, 923 (Colo.1998). Where parties are required to follow administrative procedures, the courts do not have subject matter jurisdiction to hear any dispute between them until they have exhausted those remedies, unless an exception to the doctrine applies. *Id.* One such exception is that exhaustion would be futile. *See City & County of Denver v. United Air Lines, Inc.*, 8 P.3d 1206, 1213 (Colo.2000).

As noted, we agree with NDCC's contention that the doctrine of exhaustion of administrative remedies does not apply in the circumstances presented here. That doctrine applies typically in a controversy between a private party and a governmental agency, which has its own administrative review process, often involving a hearing before a hearing officer or administrative law judge and possibly involving several tiers of administrative review. Here, in contrast, the dispute is between Hamon as general contractor and NDCC as subcontractor—two private parties.

We agree with the trial court that the mandatory claims process provision of the subcontract involves a form of alternative dispute resolution (ADR), that is, a kind of arguably mandatory arbitration, which two private parties have agreed to abide by, and which incorporates a state administrative review procedure.

Our conclusion that the administrative law doctrine of exhaustion of administrative remedies does not apply here is supported by dicta contained in *City & County of Denver v. District Court*, 939 P.2d 1353, 1363 n. 10 (Colo.1997). There, the supreme court noted:

> For clarification, we mention an additional background point: this case does not involve the doctrine of exhaustion of administrative remedies, which is statutory in nature. *See Horrell v. Dep't of Admin.*, 861 P.2d 1194, 1197 (Colo.1993) ("Where administrative remedies are provided by statute, the statutory procedure must be followed when the matter complained of is within the jurisdiction of the administrative authority."). Rather, this case in-

volves the application of ADR procedures which were bargained for by the parties at the time they entered into the Contract and which are required by the Contract. Confusion about this point may occur because the ADR provisions adopt an administrative process based upon the Municipal Code. We emphasize that the ADR provision in this case derives its force solely from the parties' agreement to use the Municipal Code as an ADR mechanism.

Similarly, the parties here have agreed to use the CDOT administrative complaint process as part of their dispute resolution mechanism.

Furthermore, we disagree with Hamon's contention that *First Christian Assembly of God v. City & County of Denver*, 122 P.3d 1089 (Colo.App.2005), compels the conclusion that NDCC was required to follow the administrative remedies provision and exhaust CDOT's claims process.

There, a division of this court stayed judicial proceedings on the plaintiff's claims until the plaintiff satisfied the contract's administrative dispute resolution requirements. 122 P.3d at 1094. The division relied on the plain language of the contract's dispute resolution clause, which stated, in pertinent part, that all disputes between the parties "shall be resolved by administrative hearings pursuant to the procedure established by Denver Revised Municipal Code 56–106" if the dispute could not be resolved through informal discussions among the parties. *Id.* at 1091. The division held that the parties' contractual dispute resolution provision required them first to engage in informal discussions before the administrative hearings process was implicated.

Similarly, here, NDCC was "required to exhaust all administrative remedies *available* pursuant to the Contract Documents, prior to commencing either litigation or arbitration" (emphasis added). Because NDCC did not maintain claims against CDOT, the CDOT claims process was not an available administrative remedy. Therefore, pursuant to the contract's plain language, the CDOT claims process did not need to be exhausted. Consequently, we conclude that *First Christian* is consistent with our decision here.

Moreover, contrary to Hamon's contention, the *First Christian* division did not state that failure to exhaust administrative remedies provided by contract would result in lack of subject matter jurisdiction. Although the division acknowledged that the contractual administrative remedy need not be pursued if the process would be futile or the requirement is waived, it did not expressly hold that the doctrine of exhaustion of administrative remedies applies to a contractual administrative remedy.

Accordingly, we conclude that this case does not implicate the administrative law doctrine of exhaustion of administrative remedies. Consequently, the trial court's conclusion that NDCC was not required to exhaust its administrative remedies does not implicate the subject matter jurisdiction of that court. For the same reason, we need not decide whether the futility exception, which derives from the doctrine of the exhaustion of administrative remedies involving state statutes and agencies, and which requires proof that is clear beyond a reasonable doubt, applies in this case. *See Golden's Concrete Co.*, 962 P.2d at 923.

## B. Breach of Contract

■ Hamon contends that, even if the dispute resolution provision is governed by contract principles, the trial court nevertheless erred in concluding that it would be futile for NDCC to pursue those administrative procedures. We disagree.

In interpreting a contract, we review the entire document, not merely isolated clauses or phrases. *First Christian Assembly*, 122 P.3d at 1089. We apply the plain meaning of the words used, subject to interpretation in light of the context and circumstances of the transaction. *Id.* An interpretation which makes a contract fair and reasonable is preferred to one which leads to a harsh or unreasonable result. *M.R. Mansfield Realty, Inc. v. Sunshine*, 38 Colo.App. 334, 336, 561 P.2d 342, 344 (1976), *aff'd*, 195 Colo. 95, 575 P.2d 847 (1978).

■ When a contract contains an ADR mechanism, the court must accord a pre-

sumption in favor of that mechanism and resolve doubts regarding the scope of an ADR clause in favor of the ADR procedures. *City & County of Denver v. Dist. Court*, 939 P.2d at 1364.

■ We apply a three-part test to determine the applicability of an ADR clause: (1) is the ADR agreement valid and binding; (2) does the agreement provide for the court or the ADR decision-maker to decide whether the dispute falls within the scope of the ADR clause; and (3) did the parties intend the dispute to fall within the scope of the ADR clause? *Id.* at 1363.

■ Finally, the law does not require a party to perform futile acts as a condition precedent to asserting its rights. *Bruce W. Higley Defined Benefit Annuity Plan v. Kidder, Peabody & Co.*, 920 P.2d 884, 890–91 (Colo.App.1996).

In interpreting the dispute resolution provision of the subcontracts here, we apply the three-part test noted above. First, it is undisputed that the dispute resolution provision of the subcontracts is valid and binding.

Second, because that provision does not specify who the parties have agreed will decide whether a particular dispute falls within the scope of the ADR clause, that determination should be made by the court, not the ADR decision-maker. *City & County of Denver v. Dist. Court*, 939 P.2d at 1363.

Third, we must determine whether the contract dispute here is subject to the CDOT claims process. To do so, we must examine both the plain language of the dispute resolution provision and the stipulation between NDCC and CDOT.

The first sentence of Section 18 states that: "Any dispute concerning this Subcontract shall be resolved initially through any claims process contained in the Contract Documents and as required of the Contractor by the Owner." As noted above, the parties agree that the claims process contained in the contract documents refers to the CDOT administrative review process.

The parties' understanding of the scope of this administrative review process must be assessed by reference to the stipulation be-

tween NDCC and CDOT. First, that stipulation provided that the CDOT administrative review process applied only to claims for which CDOT was potentially responsible. Second, the stipulation stated:

> The CDOT claims process that pertains to the phases 2/3 and 4 Contracts is not designed to, and does not and cannot resolve claims that are solely between the prime contractor and its subcontractor. The only claims which are subject to the CDOT dispute process are those that involve monies that are potentially the responsibility of CDOT.

Third, the stipulation stated that CDOT would not entertain a claim that involved a dispute solely between a contractor and a subcontractor, but it would entertain a claim that involved those parties, as well as CDOT. Fourth, the stipulation provided that NDCC had no currently pending claims against CDOT.

Under these circumstances, the claims process would not apply to NDCC's claims, which, at the time of the entry of final judgment here, were not asserted against CDOT.

Because the CDOT administrative review process did not encompass NDCC's claims, it would have been futile for NDCC to pursue this administrative review procedure. *See Bruce W. Higley*, 920 P.2d at 890–91.

The third sentence of the subcontract's dispute resolution provision provides: "In any event, subcontractor[ ] shall be required to exhaust all administrative remedies available pursuant to the Contract Documents, prior to commencing either litigation or arbitration." As noted in the above analysis, the CDOT administrative review process was not available under the circumstances here because NDCC had withdrawn its claims against CDOT in both the Phase 2/3 and Phase 4 projects.

Hamon nevertheless contends that the trial court erred in allowing NDCC to "orchestrate" the signing of a stipulation that would enable it to avoid following the CDOT administrative review process to which it had agreed in the subcontracts. However, we agree with the trial court that, regardless of NDCC's intent in entering into this stipula-

tion, the stipulation merely confirmed that the CDOT administrative review process applied only when a contractor or subcontractor asserted a claim against CDOT. Here, NDCC was free to waive its claims against CDOT and pursue what it believed was the great bulk of its claim for damages against Hamon. Under those circumstances, the CDOT administrative review process simply did not apply.

Accordingly, we conclude the trial court did not err in denying the motions to dismiss and for directed verdict filed by Hamon on the ground that NDCC was required to exhaust its administrative remedies. We further conclude that the trial court had subject matter jurisdiction and properly considered NDCC's claims against Hamon for breach of contract and breach of the prompt payment statute.

### III. Breach of Contract

Hamon next contends the trial court erred because it ignored the subcontracts' unambiguous language and relied upon improper parol evidence to create a new, independent duty that requires general contractors to schedule work only when it is convenient for their subcontractors. We disagree.

"In reviewing a breach of contract case, we defer to the trial court's findings of fact if the record supports them, and we review its conclusions of law de novo." *Albright v. McDermond*, 14 P.3d 318, 322 (Colo.2000). The interpretation of a contract is a question of law, which we review de novo. *Premier Farm Credit, PCA v. W–Cattle, LLC*, 155 P.3d 504, 517 (Colo.App.2006).

When interpreting a contract, "[a] court's primary obligation is to effectuate the intent of the contracting parties according to the plain language and meaning of the contract." *Albright*, 14 P.3d at 322. As noted, "[t]he meaning and effect of a contract [are] to be determined from a review of the entire instrument, not merely from isolated clauses or phrases." *First Christian Assembly*, 122 P.3d at 1092 (quoting *Moland v. Indus. Claim Appeals Office*, 111 P.3d 507, 510 (Colo.App.2004)).

"A contract should be interpreted to harmonize and, if possible, to give effect to all its provisions." *Id.* "The overriding rules of contract interpretation require a court to apply the plain meaning of the words used, subject to interpretation from the context and circumstances of the transaction." *Id.* (citation omitted).

Whether a contract is ambiguous is also a question of law, which we review de novo. *Pub. Serv. Co. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo.2006). A contract is ambiguous when it is reasonably susceptible of more than one meaning. *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo.2000). "The mere fact that the parties differ on their interpretations of an instrument does not of itself create an ambiguity." *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.1990).

"Every contract in Colorado contains an implied duty of good faith and fair dealing." *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo.2003). "A violation of the duty of good faith and fair dealing gives rise to a claim for breach of contract." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo.2006). "Whether a party acted in good faith is a question of fact which must be determined on a case by case basis." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499 (Colo. 1995).

"The duty of good faith and fair dealing may be relied upon 'when the manner of performance under a specific contract term allows for discretion on the part of either party.'" *Parker*, 138 P.3d at 292 (quoting *Amoco Oil Co.*, 908 P.2d at 498). "Discretion in performance occurs 'when the parties, at formation, defer a decision regarding performance terms of the contract' leaving one party with the power to set or control the terms of performance after formation." *Id.* (quoting *Amoco Oil Co.*, 908 P.2d at 498). *Cf. Tricon Kent Co. v. Lafarge North America, Inc.*, 186 P.3d 155, 158 (Colo. App.2008) (in highway construction project supervised by CDOT, no damages for delay clause valid and enforceable in Colorado, subject to exception for interference by owner or contractor).

■ Here, Section 5(a) of the subcontracts required NDCC to "prosecute the work undertaken in a prompt and diligent manner whenever such work, or any part of it, becomes available, or at such other time or times as [Hamon] may direct." Because Section 5(a) gave Hamon discretion to control the terms of NDCC's performance after the subcontracts' formation, the implied covenant of good faith and fair dealing applied to Section 5(a). *See Parker*, 138 P.3d at 292.

Furthermore, pursuant to the prime contract between Hamon and CDOT, which, as noted, was incorporated into the subcontracts, Hamon was responsible for planning, scheduling, and reporting the progress of the contracted work. *See* CDOT, *Standard Specifications for Road and Bridge Construction* § 108.03 (1999) ("The Contractor shall be responsible for planning, scheduling, and reporting the progress of the work to ensure timely completion of the work as called for in the Contract."). Specifically, Hamon was responsible for developing a critical path method schedule and a phasing plan describing the projects' sequential work. *See id.*

To effectuate Hamon's and NDCC's contractual intent, we look to the plain language of the subcontracts and the prime contract, *see Albright*, 14 P.3d at 322, and additionally consider the implied covenant of good faith and fair dealing. *See Cary*, 68 P.3d at 466. Our goal is to harmonize and give effect to all three. *See First Christian Assembly*, 122 P.3d at 1092. In so doing, we conclude that Hamon was responsible for developing and maintaining a schedule, NDCC was responsible for completing its work when directed by Hamon to do so, and Hamon was required not to abuse its discretion when directing NDCC to complete its work.

In its order, the trial court relied upon Section 5(a) of the subcontracts, the implied covenant of good faith and fair dealing, and the scheduling provisions in the prime contract to find that Hamon had the authority to resequence its scheduling plan, NDCC was not entirely without fault for the work delays, and "the vast bulk [of delays] was caused by Hamon's decision to re-sequence

the phases, and its failure to incorporate that re-sequencing into the critical path."

Contrary to Hamon's contention, the trial court did not ignore the unambiguous language of the subcontracts. We conclude the trial court properly considered the plain language of the subcontracts and the prime contract, and harmonized the relevant provisions with the implied covenant of good faith and fair dealing. We also conclude that the trial court's findings are supported by the record.

Furthermore, we note that applying Hamon's interpretation of the contract documents—that it had the power to dictate how, when, and where NDCC performed its work—without incorporating the implied covenant of good faith and fair dealing could lead to an absurd result. *Cf. Rodriguez v. Schutt*, 914 P.2d 921, 925 (Colo.1996) (interpreting statutes to prevent an absurd result). As NDCC pointed out, if the implied covenant of good faith and fair dealing were not incorporated into the contract documents, Hamon could have required it "to perform its paving work at midnight using teaspoons."

■ Additionally, even if we assume that Hamon may raise the issue of improperly admitted parol evidence for the first time on appeal, *see Magnetic Copy Servs., Inc. v. Seismic Specialists, Inc.*, 805 P.2d 1161, 1164 (Colo.App.1990), we conclude the trial court properly admitted testimony concerning construction industry standards to determine whether Hamon acted in good faith, which is a factual determination. *See Amoco Oil Co.*, 908 P.2d at 499. The trial court did not use this evidence to determine the parties' contractual intent, and, therefore, contrary to Hamon's contention, the evidence was not subject to the parol evidence rule. *See Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1237 n. 7 (Colo.1998) (the parol evidence rule prohibits the admission of extrinsic evidence to vary or contradict the written terms of a contract). Consequently, we conclude the trial court did not improperly rely upon parol evidence.

■ Hamon also asserts that the implied covenant of good faith and fair dealing did not apply to the subcontracts because they

constituted express, integrated agreements, and, accordingly, in ruling in NDCC's favor, the trial court created a new, independent duty that requires general contractors to schedule work only when it is convenient for their subcontractors. However, as noted, the covenant of good faith and fair dealing inheres in every contract in Colorado. *See Cary,* 68 P.3d at 466. We conclude the trial court did not create such a new, independent duty, but, rather, the court merely applied the implied covenant of good faith and fair dealing.

Consequently, because the trial court properly interpreted the unambiguous language of the relevant contractual provisions, did not improperly rely upon parol evidence, and did not create a new legal duty, we conclude that it did not err.

## IV. Penalty Interest

Hamon contends the trial court erred in calculating penalty interest in favor of NDCC. Pursuant to the prompt payment statute, as pertinent here, a contractor who fails to timely pay a subcontractor shall pay the subcontractor penalty interest at the rate of fifteen percent. *See* § 24–91–103, C.R.S. 2007. Specifically, Hamon argues (1) penalty interest could not begin accruing until Hamon was paid by CDOT, (2) penalty interest may not be compounded annually, (3) penalty interest does not accrue after entry of judgment, and (4) a surety cannot be liable for penalty interest. We agree in part and remand for further proceedings.

The interpretation of statutes is a question of law subject to de novo review. *McIntire v. Trammell Crow, Inc.,* 172 P.3d 977, 979 (Colo.App.2007).

"When construing statutes, our primary duty is to give effect to the intent of the General Assembly, looking first to the statute's plain language." *Id.* "If a statute is clear and unambiguous on its face, then we need not look beyond the plain language and must apply the statute as written." *Id.*

■ If a general statutory provision conflicts with a special statutory provision, the statutes shall be construed, if possible, to give effect to both. *See* § 2–4–205, C.R.S.

2007. However, if the conflict between the provisions is irreconcilable, "[a]s a general rule, a special or specific statutory provision prevails over a general provision unless the general provision is later in time and the legislature has manifested a clear intent that the general provision should prevail." *Climax Molybdenum Co. v. Walter,* 812 P.2d 1168, 1174 (Colo.1991).

Colorado's prompt payment statute provides, in pertinent part:

Whenever a contractor receives payment pursuant to this section, the contractor shall make payments to each of his subcontractors of any amounts actually received which were included in the contractor's request for payment to the public entity for such subcontracts. The contractor shall make such payments within seven calendar days of receipt of payment from the public entity in the same manner as the public entity is required to pay the contractor under this section if the subcontractor is satisfactorily performing under his contract with the contractor.... If the contractor fails to make timely payments to the subcontractor as required by this section, the contractor shall pay the subcontractor interest as specified by contract or at the rate of fifteen percent per annum whichever is higher, on the amount of the payment which was not made in a timely manner. The interest shall accrue for the period from the required payment date to the date on which payment is made.

§ 24–91–103(2), C.R.S.2007.

### A. When Does Penalty Interest Begin Accruing?

■ Hamon argues that the penalty interest should not have begun accruing until seven days after each of five installments CDOT paid Hamon between August 25, 2003 and January 10, 2006. NDCC, however, asserts that the trial court properly calculated penalty interest for the total outstanding contract earnings "from the date of final completion of the Projects" in early September 2003. We agree with Hamon.

The prompt payment statute provides that "the contractor shall make payments to each of his subcontractors of any amounts *actual-*

*ly received,*" "[t]he contractor shall make such payments *within seven calendar days of receipt of payment* from the public entity," and "interest shall accrue for the period from the required payment date to the date on which payment is made." § 24–91–103(2) (emphasis added). Based upon the plain language of the statute, Hamon was required to pay NDCC within seven days of actually receiving each installment payment from CDOT.

We therefore conclude the trial court erred when it calculated the penalty interest from the date the projects were completed. The penalty interest began accruing seven days after Hamon actually received payment from CDOT for work completed by NDCC based upon each payment installment date. Consequently, on remand, the trial court must recalculate the penalty interest accordingly.

 Furthermore, we reject NDCC's prevention doctrine argument in support of the trial court's calculation of penalty interest from the date the projects were completed. "The prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused." *Moore Bros. Co. v. Brown & Root, Inc.,* 207 F.3d 717, 725 (4th Cir.2000) (citing Restatement (Second) of Contracts § 245 (1981)); *see* 13 Lord, *Williston on Contracts* § 39:4 (4th ed.1993).

NDCC asserts that, because Hamon prevented CDOT from disbursing payment funds, the penalty interest accrual date should be measured from the date the projects were complete. However, the record shows that CDOT did not pay Hamon in part because of NDCC's outstanding administrative claims against CDOT. Accordingly, NDCC's actions were a contributing factor to the delayed payment. Therefore, we conclude that the prevention doctrine is inapplicable.

### B. Must Penalty Interest Be Compounded Annually?

 Hamon contends that the trial court erred in determining that the penalty interest should be compounded annually. NDCC asserts that the trial court's determination was correct because section 5–12–101, C.R.S. 2007, which sets the default legal rate of interest at eight percent per annum compounded annually, must be incorporated into the prompt payment statute, which is silent about compounding. We agree with Hamon.

The plain language of section 24–91–103 does not provide for the penalty interest to be compounded annually. *Cf., e.g.,* § 13–21–101, C.R.S.2007 (interest on personal injury damages must be compounded annually). Moreover, to the extent that sections 5–12–101 and 24–91–103 conflict, the more specific statutory provision prevails. *See Climax Molybdenum Co.,* 812 P.2d at 1174. Because the prompt payment statute, section 24–91–103, is more specific than the default interest statute, section 5–12–101, the prompt payment statute prevails. Consequently, we conclude that penalty interest is not compounded annually, and, thus, the trial court erred in so doing. Accordingly, on remand, the trial court must recalculate the penalty interest without compounding it annually.

### C. Does Penalty Interest Accrue After Appeal of Judgment?

 Hamon maintains the trial court erred in concluding that penalty interest may accrue after the date a judgment is appealed. It argues that applying the penalty interest to the entire judgment would "improperly allow a prevailing party to recover a windfall of inflated interest on items such as costs, prejudgment interest, and other sums not paid from public coffers." Hamon further asserts that, once a judgment is appealed, section 5–12–106, C.R.S.2007, not the prompt payment statute, applies.

Conversely, NDCC argues that the plain language of the prompt payment statute states that penalty interest accrues until the date on which payment is made, and, therefore, it is entitled to collect fifteen percent penalty interest until Hamon pays it the unpaid contract earnings.

We agree with NDCC that the prompt payment statute's fifteen percent interest continues until the unpaid contract earnings are paid, even after the date the judgment is

appealed. However, we agree with Hamon that the penalty interest only applies to unpaid contract earnings, not the entire judgment.

As noted, the prompt payment statute provides that penalty interest continues to accrue until "the date on which payment is made." § 24–91–103(2). The statute also states that "[i]f the contractor fails to make timely payments to the subcontractor[,] . . . the contractor shall pay the subcontractor interest . . . on the amount of the payment which was not made in a timely manner." *Id.*

▆▆▆▆ Based upon the plain language of the statute, penalty interest continues to accrue until the outstanding contract balance is paid, regardless of whether a judgment has been appealed. However, penalty interest only applies to the unpaid contract amount, not to the entire judgment.

To the extent that section 5–12–106, which sets forth postjudgment interest, and the prompt payment statute conflict, the more specific statutory provision prevails. *See Climax Molybdenum Co.*, 812 P.2d at 1174. Because the prompt payment statute, section 24–91–103, is more specific than the postjudgment interest statute, section 5–12–106, the prompt payment statute prevails.

We, therefore, conclude that the trial court correctly determined that penalty interest continues to accrue postjudgment and during appeal. However, the trial court erred in applying the penalty interest to the entire judgment. Accordingly, we remand for the trial court to recalculate the penalty interest based only upon the unpaid contract amount, not the entire judgment. Furthermore, the remaining amount of the judgment is subject to the postjudgment interest statute, section 5–12–106.

### D. Can a Surety Be Liable for Penalty Interest?

▆▆▆ USF & G contends that a surety cannot be liable for penalty interest. We agree to the extent that the payment bond only holds USF & G jointly and severally liable at a rate of eight percent per annum.

To effectuate Hamon's and USF & G's contractual intent, we look to the plain language of the payment bond contract. *See Albright*, 14 P.3d at 322. In the payment bond, USF & G agreed to be jointly and severally liable for Hamon's debts for labor, materials, and other supplies, with interest "at the rate of eight percent (8%) per annum until paid."

Consequently, we conclude that USF & G and Hamon are jointly and severally liable for the outstanding contract balance and eight percent interest. On remand, the trial court must recalculate the amount for which USF & G and Hamon are jointly and severally liable, as well as the amount of interest for which only Hamon is liable.

To summarize, on remand the trial court must recalculate penalty interest as follows:

(1) Calculate penalty interest seven days after Hamon actually received payment from CDOT for work completed by NDCC based upon each payment installment date;

(2) Calculate penalty interest without compounding it annually;

(3) Calculate penalty interest until the outstanding contract balance is paid, including postjudgment and during appeal; however, penalty interest applies only to the contract amount, not the entire judgment; and

(4) USF & G and Hamon are jointly and severally liable for interest at eight percent per annum, while Hamon is liable for penalty interest above that amount as noted above.

Thus, we remand the case to the trial court to recalculate the amount of the judgment against Hamon and USF & G based on our interpretation of the prompt payment statute and the contract documents as discussed above.

### V. Attorney Fees

▆▆▆ In its cross-appeal, NDCC contends the trial court abused its discretion in denying its request for attorney fees. We disagree.

A trial court has broad discretion in ruling on a request for attorney fees, and its ruling will be upheld on appeal absent an abuse of

discretion. *Hawley v. Mowatt,* 160 P.3d 421, 427 (Colo.App.2007).

In its July 7, 2006 order, the trial court denied NDCC's request for attorney fees because it found that Hamon's defenses and counterclaims did not lack substantial justification within the meaning of section 13–17–102. The court explained that, under the American rule for attorney fees, "there remains a significant difference between losing a case, even as spectacularly as [Hamon] lost it here, and being liable for attorneys fees because one's positions, factually or legally, were without substantial justification."

NDCC urges us to reverse the trial court's denial of attorney fees "in light of the [t]rial [c]ourt's overwhelming findings of Hamon's bad faith." Notwithstanding the trial court's findings of Hamon's bad faith and lack of success at trial, it still determined that Hamon's factual and legal positions were not without substantial justification. We agree. Consequently, we conclude the trial court did not abuse its discretion in denying NDCC's request for attorney fees.

Furthermore, we determine that Hamon's appeal was not frivolous and, therefore, deny NDCC's request for attorney fees on appeal.

The judgment is reversed as to the award of penalty interest, and the case is remanded for further proceedings consistent with this opinion to recalculate that award. The judgment is affirmed in all other respects. Additionally, the trial court's order denying NDCC's request for attorney fees is affirmed.

Justice ROVIRA * and Judge NEY *, JJ., concur.