2012 COA 220

**EXTREME CONSTRUCTION COMPANY, a Colorado corporation, Plaintiff–Appellant and Cross–Appellee,**

v.

**RCG GLENWOOD, LLC; and Mike Spradlin, Defendants–Appellees and Cross–Appellants.**

No. 12CA0084.

Colorado Court of Appeals, Div. VI.

Dec. 27, 2012.

Traylor, Tompkins & Black, P.C., William M. Kane, Grand Junction, Colorado, for Plaintiff–Appellant and Cross–Appellee.

Elder & Phillips, P.C., Keith Boughton, Grand Junction, Colorado, for Defendants–Appellees and Cross–Appellants.

Opinion by Judge GABRIEL.

¶ 1 In this action concerning the interpretation of a payment provision in a construction contract, plaintiff, Extreme Construction Co. (Extreme), appeals the amount of the monetary judgment that it obtained against defendant, RCG Glenwood, LLC (RCG), and the judgment entered in favor of defendant, Mike Spradlin. RCG cross-appeals the trial court's award of attorney fees, costs, and certain prejudgment interest to Extreme, and the court's denial of RCG's own request for fees and costs.

¶ 2 As an apparent matter of first impression in Colorado, we conclude that the equitable estoppel doctrine can be applied in the context of a dispute over the interpretation of an ambiguous contract provision. We then conclude that the trial court erred in finding that RCG was not equitably estopped from contesting Extreme's interpretation of the contract. Next, we conclude that the trial court did not err in finding that Extreme never accepted Spradlin's offer of a personal guarantee and that, under the contract's fee-shifting provision, Extreme was the prevailing party on its claim against RCG. Finally, we conclude that RCG has failed to show that the trial court erred in rejecting its assertions that under section 13–17–202, C.R.S. 2012, (1) the interest awarded to Extreme should have abated from the date of RCG's offer of settlement, and (2) RCG was entitled to an award of costs.

¶ 3 Accordingly, we vacate the award of damages to Extreme and remand to the trial court to recalculate those damages, based on our conclusion that RCG was estopped from contesting Extreme's interpretation of the contract. In all other respects, we affirm.

## I. Background

¶ 4 RCG, through its owner, Spradlin, negotiated for Extreme to remodel a portion of a building in exchange for RCG's payment. During the negotiations, Extreme prepared for Spradlin a budget that estimated the total price to RCG. This budget included amounts for superintendence and labor, which were derived by multiplying the estimated time for superintendence work by $68.50 per hour and the estimated time for labor by $38.50 per hour.

¶ 5 Extreme and RCG ultimately entered into a contract for the project, but the contract did not include the above-noted hourly rates or calculations. Rather, paragraph 4 of the contract provided, in pertinent part:

*Contract Price; Financing; Payment.* Owner [RCG] shall pay Builder [Extreme] in good funds on a Cost/Plus basis to a Guaranteed Maximum Price of $585,699.64 for the performance of the Work. . . . The Contract Price shall include, without limitation:

. . . .

b. Wages of construction workers directly employed by the Builder to perform the Work, including welfare, unemployment compensation, social security and other benefits.

. . . .

i. Builder's overhead and construction management fee of 5.5%, and Builder's profit of 5.5%, for a total of 11%.

¶ 6 When Extreme began construction, it mailed monthly bills to Spradlin reflecting that RCG was being billed $68.50 per hour for superintendents and $38.50 per hour for laborers, consistent with the previously-supplied budget. Spradlin subsequently discussed two of these invoices with one of Extreme's superintendents. Spradlin's main concern was that he felt that Extreme was not paying the onsite crew the labor rates reflected in the invoices, as he believed was required by the cost/plus term of the contract. The superintendent explained to Spradlin that the labor rates were preset and that they included more than just the actual hourly wages of the employees. For example, the rates included payroll taxes, workers' compensation, and unemployment insurance. After these conversations, Spradlin did not pursue the issue further. To the contrary, when he paid Extreme's invoices (or portions of them), he did so without objecting to the manner in which Extreme had billed for superintendence and labor.

¶ 7 Some of RCG's checks bounced, and Extreme's owner spoke with Spradlin each time this occurred. At no time did Spradlin dispute the hourly rates contained in Extreme's invoices. Rather, he said that he was working on obtaining new financing.

¶ 8 Because RCG had failed to pay its bills, Extreme had the "absolute right" under the contract to cease all construction activity. Based on the conversations with Spradlin, however, Extreme decided to continue working and ultimately completed the project on time, to Spradlin's satisfaction, and for approximately $45,000 less than the Guaranteed Maximum Price.

¶ 9 RCG, however, still failed to pay Extreme's outstanding invoices in full. There-

after, Spradlin wrote to Extreme and proposed a payment schedule and "a promissory note, personally guaranteed." He asked that Extreme not file a lien against the property, with the caveat, "If you cant [sic] I understand." After receiving this letter, Extreme did not file a lien and prepared a promissory note for Spradlin's signature. Although this note does not appear to be in the record, it is undisputed that Spradlin never signed the note.

¶ 10 Thereafter, Extreme filed this lawsuit, claiming that RCG had breached the contract and that Spradlin had breached his personal guarantee. In response, RCG and Spradlin asserted that Extreme had overbilled RCG. As pertinent here, they argued that the contract was unambiguous and only allowed Extreme to bill RCG at Extreme's "cost" (i.e., the actual costs from vendors and the actual wages paid to Extreme's employees) plus 11% for profit and overhead. RCG and Spradlin contended that Extreme was not permitted to bill for superintendence and labor on an hourly basis.

¶ 11 Extreme replied that paragraph 4 of the contract was ambiguous and that extrinsic evidence, including the parties' precontractual agreement on the budget, favored its interpretation of that provision. Extreme also argued, among other things, that RCG was estopped from contesting Extreme's interpretation of the contract, because (1) RCG had full knowledge of the facts and unreasonably delayed in asserting its position as to the superintendence and labor costs, and (2) Extreme prejudicially relied on RCG's acquiescence in Extreme's contrary interpretation. In addition, Extreme argued that Spradlin had personally guaranteed the remaining amount due in exchange for Extreme's agreement not to exercise its lien rights. The court ultimately found that paragraph 4 was ambiguous but that the extrinsic evidence supported RCG's and Spradlin's interpretation, namely, that the contract required superintendence and labor to be billed at Extreme's actual costs and precluded Extreme from charging $68.50 per hour for superintendence and $38.50 per hour for labor. In addition, the court rejected Extreme's estoppel argument and further found

that, to the extent Spradlin had offered to guarantee RCG's debt, there was no evidence that Extreme had ever accepted that offer.

¶ 12 The court then entered judgment in favor of Extreme and against RCG in the amount of $18,523.65. Because this amount was significantly less than the amount that Extreme had sought at trial, RCG argued that it was the prevailing party under a fee-shifting provision in the contract. It further argued, as pertinent here, that because the amount of the judgment was less than an offer of settlement that it had made under section 13–17–202, any interest to be awarded to Extreme had to be abated as of the date of the offer, and RCG was entitled to an award of costs.

¶ 13 The court rejected each of these arguments. Specifically, the court found that Extreme was the prevailing party because it had recovered on its claim for breach of contract. In addition, the court found that RCG's settlement offer had included a nonmonetary condition and thus did not constitute an offer of settlement under the statute. Accordingly, RCG's statutory arguments failed.

¶ 14 Extreme now appeals the amount of the monetary judgment that it obtained against RCG and the judgment in favor of Spradlin, and RCG cross-appeals the court's rulings on the various attorney fee and cost motions.

## II. Equitable Estoppel

¶ 15 Extreme contends that contrary to the trial court's holding, RCG was equitably estopped from contesting Extreme's interpretation of the construction contract. We agree.

### A. Applicability to Contracts

¶ 16 As an initial matter, we address the question raised by RCG as to whether the equitable estoppel doctrine applies in disputes over contract interpretation and, if so, under what circumstances.

¶ 17 The question of whether equitable estoppel applies in disputes over contract interpretation is purely a question of law, which we review de novo. *See People v.*

*Blue,* 253 P.3d 1273, 1276 (Colo.App.2011) (observing, in the context of a question of appellate jurisdiction, that when the underlying facts are not disputed and the issue is purely one of law, we review the issue de novo).

¶ 18 As our supreme court has long recognized, one form of estoppel arises from acts done under or in the performance of a contract. *In re Schofield's Estate,* 101 Colo. 443, 447, 73 P.2d 1381, 1383 (1937). Thus, Colorado courts have applied the estoppel doctrine in appropriate circumstances to preclude parties from arguing that certain contractual provisions are unenforceable. *See, e.g., City of Colorado Springs v. Kitty Hawk Dev. Co.,* 154 Colo. 535, 546, 392 P.2d 467, 473 (1964) (having received and retained the benefits of a contract, a party was estopped from asserting that a compensation provision of that contract was ultra vires or unconstitutional); *Kiewit W. Co. v. City & Cnty. of Denver,* 902 P.2d 421, 423–24 (Colo.App.1994) (holding that the plaintiff was estopped from asserting that certain claims submission and dispute resolution provisions of the parties' contracts were ultra vires and unenforceable, where both parties had received certain benefits from the contracts).

¶ 19 One exception to the applicability of the estoppel doctrine in contract actions concerns insurance contracts. Specifically, our supreme court has held that the equitable estoppel and waiver doctrines may not be employed to extend the coverage term of an insurance policy. *See Hartford Live Stock Ins. Co. v. Phillips,* 150 Colo. 349, 352, 372 P.2d 740, 742 (1962); *accord Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.,* 764 P.2d 1191, 1198 (Colo.1988).

¶ 20 Even in the area of insurance law, however, our supreme court has observed that the equitable estoppel and waiver doctrines may be applied to preclude an insurer from asserting a forfeiture of a policy. *See Empire Cas. Co.,* 764 P.2d at 1198; *Hartford Live Stock Ins. Co.,* 150 Colo. at 352, 372 P.2d at 742. Similarly, in *Management Specialists, Inc. v. Northfield Insurance Co.,* 117 P.3d 32, 37 (Colo.App.2004), a division of this court noted that if an insurer assumes and conducts a defense of an action brought against an insured without disclaiming liability and giving notice of its reservation of rights, and if the insurer's conduct prejudiced the insured, then the insurer may thereafter be precluded from denying coverage. *See also State Farm Mut. Auto. Ins. Co. v. Stein,* 940 P.2d 384, 387 (Colo.1997) (noting that both the insured and insurer are bound by the terms of an insurance policy unless those terms are waived or annulled); *Chacon v. Am. Family Mut. Ins. Co.,* 788 P.2d 748, 750 (Colo.1990) (same).

¶ 21 Although no Colorado appellate court appears to have addressed the issue, authority from outside Colorado has extended the foregoing principles to preclude a contracting party from contesting an interpretation of an ambiguous contract term, when all elements of the estoppel doctrine have been satisfied. *See, e.g., Kane. v. Aetna Life Ins.,* 893 F.2d 1283, 1285–86 (11th Cir.1990) (noting that the equitable estoppel doctrine could apply when an insurer's representations to its insured were interpretations, as opposed to oral modifications, of an ambiguous policy provision and when the insured relied on those interpretations to her detriment); *Derry Twp. Sch. Dist. v. Suburban Roofing Co.,* 102 Pa. Cmwlth. 54, 517 A.2d 225, 229 (1986) (holding that a school district was estopped from denying compensation to a contractor when the contractor relied to its detriment on the district's initial, but subsequently altered, interpretation of the parties' contract); *cf. Five Oaks Homeowners Ass'n v. Efirds Pest Control Co.,* 75 N.C.App. 635, 331 S.E.2d 296, 298 (1985) (rejecting the plaintiffs' argument that the defendant was equitably estopped from enforcing the unambiguous termination provision of the parties' contract, and noting that "[w]hen the language of a written contract is plain and unambiguous, the contract must be interpreted as written and the parties are bound by its terms; neither party can deny knowledge of its contents") (citation omitted).

¶ 22 We are persuaded by the cases cited above and thus conclude, as an apparent matter of first impression in Colorado, that, at least in cases involving the construction of an ambiguous contractual provision unrelated to insurance coverage, the equitable estoppel doctrine can preclude a party

from contesting a particular interpretation of that provision, if all of the elements of the equitable estoppel doctrine have been satisfied.

## B. Ambiguity

¶ 23 Having thus concluded, we must determine whether the provision at issue, paragraph 4, was ambiguous. We agree with the trial court's conclusion that it was.

¶ 24 Whether a contract is ambiguous is a question of law that we review de novo. *New Design Constr. Co. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1181 (Colo.App.2008). A contract is ambiguous when it is reasonably susceptible of more than one meaning. *Id.*

¶ 25 Here, as the trial court observed, the phrase "without limitation" in paragraph 4 meant that the subsections within that paragraph were merely illustrative, not comprehensive. *See St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206–07 (5th Cir.1996) (noting that the word "including" "is generally given an *expansive* reading, even without the additional if not redundant language of 'without limitation' "). Moreover, Colorado courts have often found the term "cost" to be ambiguous in provisions similar to the one at issue. *See Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo.1984) (concluding that the term "at seller's cost" was facially ambiguous because it could be interpreted as the cost of water actually used by the buyer, charged at the same rate as the seller paid for the water, or the cost actually expended by the seller in furnishing water to all of its users, even though that cost exceeded the amount the seller itself paid for the water); *Portercare Adventist Health Sys. v. Lego,* —— P.3d ——, —— n. 5, 2010 WL 3584394 (Colo.App. 2010), *as modified on denial of reh'g* (Oct. 28, 2010) (noting that a requirement that an insured pay "all costs of services and care" was ambiguous because it could refer either to the hospital's costs to provide the services or the hospital's charges for those services), *rev'd on other grounds*, 2012 CO 58, 286 P.3d 525; *Hott v. Tillotson–Lewis Constr. Co.*, 682 P.2d 1220, 1223 (Colo.App.1983) (concluding that the phrase "cost-plus" in a construction contract was ambiguous).

¶ 26 Although RCG suggests on appeal that the trial court erred in holding that paragraph 4 was ambiguous, RCG provides no supporting argument or authority for this specific assertion. Rather, after noting that the court had found the term "cost" to be ambiguous, RCG states, in a parenthetical, "with which RCG urges is error on law [sic], but no matter." RCG then proceeds to argue why the extrinsic evidence supported its interpretation. In these circumstances, we will not consider RCG's conclusory assertion that the trial court erred in holding that paragraph 4 was ambiguous. *See Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 19 (Colo.App.2010) ("We will not consider a bald legal proposition presented without argument or development.").

## C. Application of Estoppel Principles

¶ 27 The question thus becomes whether the trial court erred in rejecting Extreme's contention that RCG was equitably estopped from arguing its interpretation of the contract, namely, that the contract required superintendence and labor to be billed at Extreme's actual costs and precluded Extreme from charging $68.50 per hour for superintendence and $38.50 per hour for labor. We conclude that the court erred.

¶ 28 Whether the circumstances of a particular case support the application of the equitable estoppel doctrine is a question of fact, and we must accept findings of fact on review unless they are clearly erroneous. *See City of Black Hawk v. Ficke*, 215 P.3d 1129, 1132 (Colo.App.2008). When the controlling facts are undisputed, however, the legal effect of those facts constitutes a question of law, which we review de novo. *Turbyne v. People*, 151 P.3d 563, 572 (Colo.2007).

¶ 29 To establish equitable estoppel by reason of delay, the party asserting the doctrine must establish that (1) the other party had full knowledge of the facts, (2) the other party unreasonably delayed in asserting an available remedy, and (3) the party asserting the doctrine relied on the other party's delay to its detriment. *See Manor Vail Condo. Ass'n v. Town of Vail*, 199 Colo. 62, 64, 604 P.2d 1168, 1170 (1980).

¶ 30 Here, the trial court found, with ample record support, that the first element was satisfied: "There is no question that RCG paid some of Plaintiff's invoices with full knowledge that they included charges for superintendence and labor at hourly rates which exceeded Plaintiff's costs." The fact that RCG discussed with one of Extreme's superintendents some of its concerns regarding the billing rates does not mandate a different result. As noted above, when RCG inquired about those rates, Extreme's superintendent explained that the billing rate was preset and that it included more than just the laborer's hourly wages. Thereafter, RCG continued to pay the amounts invoiced without objection until the project was completed.

¶ 31 With respect to the second element of equitable estoppel, the trial court concluded that "RCG's delay in seeking redress was not unreasonable because its alternative, to refuse to pay, would have halted the project while the parties negotiated and likely litigated their dispute." In so holding, we conclude, on the undisputed facts presented, that the trial court erred. *See Turbyne*, 151 P.3d at 572 (when the controlling facts are undisputed, the legal effect of those facts presents a question of law).

¶ 32 "There are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed on either side is continued in spite of a known excuse, the right to rely upon the known excuse is waived." 13 Richard A. Lord, *Williston on Contracts* § 39:31, at 639 (4th ed. 2000). In our view, this principle applies equally here. Thus, we conclude that, for purposes of equitable estoppel, it is unreasonable for a contracting party who knows of, but secretly disagrees with, the other side's contract interpretation to delay challenging that interpretation until the other side has completed its performance. This is particularly true in a case such as this one, where the record shows that the first party (here, RCG) intentionally remained silent *specifically to induce the other party's (here, Extreme's) continued performance.*

¶ 33 *Ervin v. Amoco Oil Co.*, 885 P.2d 246, 256 (Colo.App.1994), *aff'd in part and rev'd in part on other grounds*, 908 P.2d 493 (Colo. 1995), on which the trial court relied, is not to the contrary. In *Ervin*, the division rejected the defendant oil company's assertion that the trial court erred in refusing to instruct the jury on the affirmative defense of estoppel. There, the defendant argued that the plaintiff retail service station dealers, who were the defendant's lessees, could and should have exercised their rights under the Petroleum Marketing Practices Act. *Id.* To do so, however, the plaintiffs would have had to terminate their leases, thus risking their entire investments. *Id.* at 256–57. On these facts, in which the dealers were essentially claiming economic duress, the division held that the trial court's refusal to instruct on the affirmative defense of estoppel seemed "particularly appropriate." *Id.* at 257.

¶ 34 Unlike in *Ervin*, there is no issue here of any party's taking or refusing to take a position based on economic duress. Nor does the record support a finding that RCG would have had to terminate the construction contract or risk its entire investment had it timely pursued the question of the contract's proper construction.

¶ 35 With respect to the third of the above-described elements of equitable estoppel, the trial court concluded that Extreme did not show prejudicial reliance on RCG's delay because Extreme "merely did what it was contractually obligated to do, finish the project on a cost/plus basis." For three reasons, we conclude, on the undisputed facts presented, that this was error. *See Turbyne*, 151 P.3d at 572 (when the controlling facts are undisputed, the legal effect of those facts presents a question of law).

¶ 36 First, Extreme was not contractually obligated to finish the project because RCG had failed to pay its monthly bills, and the contract itself provided that in such circumstances, Extreme could cease work. Moreover, even absent such a provision, a material breach by RCG would have excused Extreme's nonperformance. *See Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636, 641 (Colo.App.1999) (noting that absent any unsatisfied condition precedent, performance

under a contract is excused by a material breach by the other party).

¶ 37 Second, the court's reasoning appears to be inconsistent with its own conclusion, with which we agree, that paragraph 4 of the contract was ambiguous (i.e., reasonably susceptible of both parties' interpretations). Having thus found, we perceive no basis for the court to have then assumed that one of the reasonable interpretations was correct, when it proceeded to apply the equitable estoppel doctrine.

¶ 38 Third, as the trial court found, RCG remained silent specifically to induce Extreme not to assert its contractual rights. At a minimum, had RCG timely pursued its purported disagreement with Extreme's interpretation, the parties could have resolved their disagreement before Extreme expended substantial time and effort based on a different contract interpretation. In our view, Extreme's reliance was therefore detrimental.

¶ 39 For these reasons, we conclude that RCG was estopped from arguing that the contract precluded Extreme from charging $68.50 per hour for superintendence and $38.50 per hour for labor. Accordingly, we vacate the award of damages on Extreme's contract claim and remand to the trial court to recalculate those damages.

¶ 40 In light of our disposition, we need not address the other contentions that Extreme offers in support of its contract interpretation.

### III. Personal Guarantee

¶ 41 Extreme next contends that the trial court erred in finding that Extreme never accepted Spradlin's offer of a personal guarantee. We are not persuaded.

¶ 42 The issue of whether an offer was accepted is a question of fact. *Lockhart v. Elm*, 736 P.2d 429, 431 (Colo.App.1987). We review a trial court's factual findings for clear error. *Former TCHR, LLC v. First Hand Mgmt. LLC*, 2012 COA 129, ¶ 37, —— P.3d ——, 2012 WL 3127336.

¶ 43 Like other contracts, an agreement to guarantee a debt is formed only when, among other things, an offer is made and accepted. *See Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo.App.2008) (noting that a contract is formed when an offer is made and accepted and the agreement is supported by consideration); *A.R.A. Mfg. Co. v. Cohen*, 654 P.2d 857, 859 (Colo.App.1982) (noting that because a guarantee is a specialized type of contract, mutual assent and consideration are required). "Acceptance of an offer is generally defined as words or conduct that, when objectively viewed, manifests an intent to accept an offer." *Marquardt*, 200 P.3d at 1129.

¶ 44 Acceptance of a guarantee can occur through "knowledge or information coming to the guarantor, through any source, that the guarantee is acting under the guaranty and extending credit on the strength thereof." *Taylor v. Hake*, 92 Colo. 330, 336, 20 P.2d 546, 549 (1933). As with other contracts, however, if the offeror of a guarantee prescribes a particular time, place, or other condition of acceptance, then the offer can be accepted only in the manner prescribed. *See Union Interchange, Inc. v. Sierota*, 144 Colo. 293, 295–96, 355 P.2d 1089, 1091 (1960) (noting that an offeror can prescribe the time, place, form, or other condition of acceptance); *see also* 1 Joseph M. Perillo, *Corbin on Contracts* § 3.14, at 377 (rev. ed. 1993) ("One who offers to be surety or guarantor for another can prescribe or suggest the mode of acceptance, just as in other cases.") (footnote omitted). Moreover, silence or inaction will not be deemed acceptance of an offer unless the relationship between the parties justifies such an inference. *See Haberl v. Bigelow*, 855 P.2d 1368, 1374 (Colo.1993).

¶ 45 Here, Spradlin offered his personal guarantee in a letter that read, in pertinent part:

> I would like to propose a bi-weekly or monthly payment to you beginning December 1st. I would propose no less than 10k and no more than 20k. I will be retiring a note in December that will free up another substantial sum monthly as well. A fair interest rate on the unpaid balance would motivate my timely payoff. I would propose a promissory note, personally guaranteed.

I would ask that you not lien or begin legal action on the Glenwood property, as that would only complicate the issue and spend monies that could be used to pay down the outstanding balance. If you cant [sic] I understand but it is the livelihood of the four stores collectively that will ensure the most prompt payback.

¶ 46 As the trial court found, Spradlin did not request Extreme's forbearance from filing a lien in return for his guarantee (indeed, he acknowledged that he would understand if Extreme chose to file a lien). Rather, Spradlin offered to sign a promissory note, personally guaranteed, that would allow RCG to make payments pursuant to a to-be-agreed-upon payment schedule. There is no evidence in the record, however, to indicate that the parties ever agreed on a new payment schedule or the amounts of the periodic payments, or that Extreme accepted Spradlin's proposal. Moreover, as noted above, silence or inaction will not be deemed an acceptance of an offer absent a relationship between the parties justifying such an inference. *See Haberl,* 855 P.2d at 1374. Nor was there any evidence that Spradlin knew that Extreme was extending additional credit to RCG on the strength of his personal guarantee, which also might have permitted an inference of acceptance. *See Taylor,* 92 Colo. at 336, 20 P.2d at 549 (noting that acceptance of a guarantee can be found when the guarantor knows that the recipient of the guarantee is acting under that guarantee).

¶ 47 Accordingly, we perceive no clear error in the trial court's finding that Extreme's conduct, objectively viewed, did not manifest an intent to accept Spradlin's offer of a personal guarantee.

¶ 48 Notwithstanding the foregoing, Extreme contends that the trial court misconstrued the argument that it had made at trial, which was that Spradlin's letter was merely evidence of earlier offers. We reject this contention for two reasons.

¶ 49 First, Extreme has not cited, and we have not found, where in the trial court record it made this argument, notwithstanding the requirement of our appellate rules that an appellant cite the precise location in the record where an issue was raised and

ruled on. *See* C.A.R. 28(k). Indeed, Extreme appears to have made the contrary argument in the trial court, asserting in both its complaint and its trial brief that Spradlin's letter was the personal guarantee, as opposed to simply evidence of a prior agreement.

¶ 50 Second, we have not found any evidence in the record that would support Extreme's contention. Extreme cites the testimony of its owner, but the owner did not testify to any distinction between Spradlin's letter, in which he offered a personal guarantee through a promissory note, and any earlier statements regarding a personal guarantee.

¶ 51 Accordingly, we conclude that the trial court did not clearly err in finding that Extreme failed to accept Spradlin's offer of a personal guarantee.

## IV. RCG's Cross–Appeal

¶ 52 In its cross-appeal, RCG raises two contentions, both of which depend on the amount of Extreme's monetary judgment, which will be recalculated on remand. Nonetheless, we address the two contentions, because the underlying legal issues that RCG has raised are likely to recur on remand.

### A. Prevailing Party

¶ 53 RCG contends that the trial court erred in ruling that under the fee-shifting provision in the contract, Extreme, and not RCG, was the prevailing party. We are not persuaded.

¶ 54 RCG argues that it was the prevailing party under the fee-shifting provision because, although it was found to have violated the contract, Extreme recovered only a small percentage of the damages that it sought. Under a contract's fee-shifting provision, however, "where a claim exists for a violation of a contractual obligation, the party in whose favor the decision or verdict on liability is rendered is the prevailing party for purposes of awarding attorney fees." *Dennis I. Spencer Contractor, Inc. v. City of Aurora,* 884 P.2d 326, 332 (Colo.1994).

¶ 55 *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230–31 (Colo.2004) and *Grynberg v. Agri Tech, Inc.*, 985 P.2d 59, 64 (Colo.App.1999), *aff'd*, 10 P.3d 1267 (Colo.2000), on which RCG relies, are inapposite. As a division of this court has opined, *Spencer* articulated the test for a "prevailing party" under a contract, whereas *Archer* was a tort case and involved a cost award to a prevailing party under C.R.C.P. 54(d). *See Pastrana v. Hudock*, 140 P.3d 188, 190–91 (Colo.App.2006). Similarly, *Grynberg* involved the issue of prevailing parties under sections 13–16–104, –105, and –108, C.R.S.2012, not the test for a prevailing party under a contract. *See Grynberg*, 985 P.2d at 64.

¶ 56 Accordingly, we conclude that the trial court correctly found that Extreme was the prevailing party on its contract claim against RCG, and Extreme will remain the prevailing party once the trial court recalculates its damages.

## B. Settlement Offer

¶ 57 RCG further contends that the trial court erred in rejecting its assertion that under section 13–17–202, the interest awarded to Extreme should have abated as of the time of the offer of settlement. Although unclear, RCG also appears to assert that the court erred in refusing to award it costs under section 13–17–202. We are not persuaded.

¶ 58 In making its determination here, the trial court reasoned that RCG did not make a qualifying offer of settlement under section 13–17–202. RCG does not even mention this reasoning in its appellate briefs, let alone contest that reasoning with argument and supporting legal authority. Accordingly, RCG has presented only a bald legal proposition without argument or development, and we therefore will not consider it. *See Barnett*, 252 P.3d at 19.

## V. Conclusion and Remand Order

¶ 59 For these reasons, we vacate the award of damages to Extreme and remand to the trial court to recalculate those damages, based on our conclusion that RCG is estopped from contesting Extreme's interpretation of the contract. In all other respects, we affirm.

Judge KAPELKE * and Judge NIETO * concur.