2015 COA 103

In the Interest of Galen L. NEHER,
Protected Person, Appellant,

v.

Christopher L. NEHER,
Petitioner–Appellee,

and

Ronald W. Servis, Special Conservator,
Attorney–Appellee.

Court of Appeals No. 13CA1710

Colorado Court of Appeals,
Div. IV.

Announced July 30, 2015

Solem Mack & Steinhoff, P.C., R. Eric Solem, Lance E. McKinley, Englewood, Colorado, for Appellant.

Robert A. Lees and Associates, Robert A. Lees, Greenwood Village, Colorado, for Petitioner–Appellee and Attorney–Appellee.

Opinion by JUDGE WEBB

¶ 1 A conservatorship destroys the protected person's autonomy. Not surprisingly, then, even if a person's property "will be wasted or dissipated unless management is provided," Colorado statutes limit the circumstances in which a court can appoint a conservator. § 15–14–401(1)(b)(II), C.R.S. 2014. This appeal centers on the requirement that clear and convincing evidence must show the person is unable to manage his or her property or business affairs *because* the person is "unable to effectively receive or evaluate information." § 15–14–401(1)(b)(I).

¶ 2 But should this statute be interpreted—as respondent/protected person Galen L. Neher (Father) argues—to also require that the evidence include medical testimony of the inability? We answer this novel question "no," and conclude that although the only medical evidence presented indicated that a conservatorship was not required, the trial

court's order appointing a permanent conservator was not clearly erroneous. We reject Father's other contentions and affirm that order.

## I. Background

¶ 3 After receiving several unsolicited e-mails asking for money, Father sent almost $500,000 to anonymous offshore bank accounts in transfers ranging from $1000 to $155,000. Suspecting fraud, his son, Christopher L. Neher (Son), petitioned the court to appoint a special conservator over Father's financial affairs.

¶ 4 The same day that Son petitioned, the court appointed him as special conservator and set a hearing. Then Son moved to cancel the hearing and rescind the conservatorship, but if the court decided to continue the special conservatorship, to appoint a third party as conservator. The court denied the motion to rescind and appointed Deputy Public Administrator, Ronald W. Servis, as special conservator. The court also appointed counsel to assist Father in opposing the petition.

¶ 5 At the first hearing, the parties agreed that Father would undergo a psychological evaluation. The hearing was continued until September. Dr. Stuart Kutz evaluated Father, but he neither prepared a report nor testified.

¶ 6 At the September hearing, Father offered to present evaluations from his primary care physician and his long-term therapist. The court declined to proceed with the hearing on this basis. It granted Son's motion for a psychological evaluation of Father by Dr. Kathryn Kaye and reset the hearing.

¶ 7 On January 4, 2013, the court called the matter up for hearing. But before receiving any testimony, the court invited counsel into chambers, without the parties present, for an off-the-record discussion. According to an affidavit from Father's counsel, the court discussed the apparent need for a protective order.

¶ 8 When the court resumed the hearing, Dr. Kaye testified and affirmed the conclusion in her filed report that Father did not meet the standards for appointing a conservator. At that point, the parties entered into an oral stipulation, which counsel were to reduce to writing. The stipulation provided that although Father would retake control of his affairs in February, for one year he would remain under an accounting firm's "monitoring" and Servis's oversight. The stipulation also forbade Father from transferring funds offshore during that time and provided that if he violated any of its restrictions, either Son or Servis could approach the court. However, the parties did not explain exactly what "monitoring" meant.

¶ 9 Later, the parties disagreed over the terms to be included in a written stipulation. Because of this disagreement, Servis did not return control of Father's estate to him, and Father moved to enforce the oral stipulation. The court directed the parties to set another hearing, which was scheduled for April.

¶ 10 Before that hearing began, the court again invited counsel for both parties to discuss the case in chambers, off the record, and without the parties present. According to the affidavit of Father's counsel, he revealed that Father had attempted to create an offshore trust in the Cook Islands, for the purpose of removing all of his assets from Colorado.

¶ 11 On the record, the court heard argument concerning the stipulation but did not receive any evidence. It denied Father's motion to enforce the stipulation, granted Son's request for a second psychological evaluation, and reset the hearing for May.

¶ 12 The second psychological evaluation did not occur. Mid-afternoon on the day before the May hearing, Son disclosed Gregory Taylor, a certified public accountant (CPA), as an expert witness. Father's counsel immediately filed a motion to strike the disclosure as untimely and incomplete. He did not request a continuance.

¶ 13 Father renewed his objection at the hearing, but again failed to request a continuance. The court allowed Taylor to testify as an expert. After hearing testimony from other experts and Father, the court "continue[d] Mr. Servis' position as the conservator."

¶ 14 Later, the court entered a written order finding by "clear and convincing evidence, pursuant to C.R.S. § 15–14–401(1)(b)(I), that the Respondent [wa]s unable to manage his property and business affairs because he [could not] effectively receive and evaluate information related to the same." The court also found that under section 15–14–401(1)(b)(II), "the Respondent ha[d] property that w[ould] be wasted or dissipated unless management [wa]s provided and that protection [wa]s necessary to protect the Respondent's Estate."

¶ 15 Father moved for a new trial under C.R.C.P. 59(a). He also requested the trial judge to recuse, primarily asserting that because the judge "[i]ndicat[ed] an intent to enter a protective order before evidence of any impairment was entered into the record," he had a "bent of mind." The court declined to recuse and denied the motion.

¶ 16 Father appeals, primarily on the ground that no medical evidence supported the petition.

## II. A Court Can Appoint a Conservator Without Medical Evidence Concerning the Respondent.

■ ¶ 17 Father contends the conservatorship statute "clearly requires medical evidence before a court can properly make a determination of whether an individual is impaired." Because the current statute does not include such a requirement and the prior statute was amended to remove language that might have suggested it, we reject this contention.

### A. Preservation and Standard of Review

¶ 18 We assume, without deciding, that this issue is preserved based on Son's concession that Father preserved this issue by raising it in his written new trial motion, on which the trial court ruled.

¶ 19 Questions of statutory interpretation are reviewed de novo. *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 593 (Colo. 2005). Because a court's primary duty is to give full effect to the General Assembly's intent as expressed by the language it chose,

interpretation begins by examining the statute's plain language within the context of the statute as a whole. *Bd. of Cnty. Comm'rs v. Hygiene Fire Prot. Dist.*, 221 P.3d 1063, 1066 (Colo.2009). "Words and phrases should be given effect according to their plain and ordinary meaning...." *Farmers Grp., Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991). If the statute is "clear and unambiguous on its face," then the court applies it as written. *Wells Fargo Bank, Nat'l Ass'n v. Kopfman*, 226 P.3d 1068, 1072 (Colo.2010).

### B. Law

¶ 20 A court may appoint a conservator of an adult if it determines:

(I) By clear and convincing evidence, the individual is unable to manage property and business affairs because the individual is unable to effectively receive or evaluate information or both or to make or communicate decisions, even with the use of appropriate and reasonably available technological assistance, or because the individual is missing, detained, or unable to return to the United States; and

(II) By a preponderance of evidence, the individual has property that will be wasted or dissipated unless management is provided or money is needed for the support, care, education, health, and welfare of the individual or of individuals who are entitled to the individual's support and that protection is necessary or desirable to obtain or provide money

§ 15–14–401(1)(b).

### C. Application

¶ 21 Father concedes that because "there ha[d] been dissipation of his estate" under section 15–14–401(1)(b)(II), the second prong of the statute was met. Still, he argues that because the statute requires medical evidence to satisfy the "clear and convincing" standard in the first prong, Son did not meet this burden.

¶ 22 For the following reasons, we decline to interpret section 15–14–401(1)(b)(I) as requiring medical evidence concerning a respondent.

¶ 23 A statute may expressly require expert testimony. *See, e.g.,* § 16–13–303(6)(b)(III), C.R.S.2014 ("Traces of a controlled substance were discovered on the currency or an animal trained in the olfactory detection of controlled substances indicated the presence of the odor of a controlled substance on the currency as testified to by an expert witness."). Although the General Assembly knew how to require such evidence, its failure to do so in the conservatorship statute indicates purposeful omission. *See Shelter Mut. Ins. Co. v. Mid–Century Ins. Co.,* 246 P.3d 651, 662 (Colo.2011) ("Based on these statutes that designated primary insurers, had the General Assembly wanted to identify an owner's insurer as primary, it knew how to do so."); *see also Specialty Rests. Corp. v. Nelson,* 231 P.3d 393, 397 (Colo.2010) ("[T]he General Assembly's failure to include particular language is a statement of legislative intent.").

¶ 24 Nor does the current statute require the petitioner to show the cause of the respondent's inability to "effectively receive or evaluate information or both or to make or communicate decisions." § 15–14–401(1)(b)(I). The 2000 amendment removed the phrase "mental illness," which might have required medical evidence. *See Estate of Hickle v. Carney,* 748 P.2d 360, 361 (Colo. App.1987) ("Section 15–14–401(3), C.R.S., authorizes the appointment of a conservator only if 'the court determines that the person is unable to manage [her] property and affairs effectively for reasons such as mental illness....' " (quoting previous conservatorship statute)). And "[t]he deletion of statutory language by the legislature renders the language inoperative and indicates that the legislature has admitted a different intent." *Grover v. Indus. Comm'n of Colo.,* 759 P.2d 705, 710 (Colo.1988) (internal quotation marks omitted).

¶ 25 Our interpretation is consistent with other statutes relating to conservatorship proceedings. Under section 15–14–406.5(1), C.R.S.2014, "the court *may* order a professional evaluation of the respondent," but "*shall* order the evaluation *if* the respondent so demands." (Emphasis added.) Thus, either side or both sides may elect to proceed without medical evidence. And under section 15–14–408(1), C.R.S.2014, respondents may subpoena an examiner; otherwise, the examiner is not required to testify.

¶ 26 Comparing Colorado's statute to the Uniform Probate Code illuminates legislative intent. The Colorado Probate Code "is modeled on the Uniform Law Commissioners' Uniform Probate Code ('UPC'), which Colorado originally adopted in 1974." *Beren v. Beren,* 2015 CO 29, ¶ 13, 349 P.3d 233. Section 15–14–401(1)(b)(I) parallels its UPC counterpart, with one significant exception. The UPC analog requires clear and convincing evidence that "the individual is unable to manage property and business affairs because of *an impairment* in the ability to receive and evaluate information or make decisions." Unif. Probate Code § 5–401(2)(A) (amended 2010) (emphasis added). But the current Colorado statute does not mention the term "impairment," which could have a medical connotation implicating expert testimony.

¶ 27 Father's remaining arguments do not support a different outcome:

- Although Colorado's Petition for Appointment of Conservator for Adult form (JDF 876) includes a box to be checked affirming attachment of a physician's letter, the form does not mandate medical evidence; instead, the box merely directs the respondent's and the court's attention to any medical evidence the petitioner has chosen to attach, which could shape further proceedings.

- Likewise, C.R.P.P. 27.1 does not mandate medical evidence; rather, it only sets out the required contents of "[a]ny physician's letter or professional evaluation," should the court demand an evaluation or any of the parties chooses to proceed with one.

- Father's argument that because "medical evidence is almost certainly required for a Protected Person to successfully seek to *terminate* a conservatorship," the same requirement applies to imposing a conservatorship, also fails. Section 15–14–431(3)–(4), C.R.S.2014, does not include any such requirement. To the contrary, section 15–14–431(4.5)(a)(II)

makes clear that a conservator "*may* file a motion for instructions concerning" whether "any further investigation or professional evaluation of the protected person should be conducted." (Emphasis added.)

- Father's citation to out-of-state authority is unpersuasive. In *Whitnum–Baker v. Appeal from Probate*, No. FSTCV125013979S, 2013 WL 4734887, at *10 (Conn.Super.Ct. Aug. 12, 2013), the court relied on a statute that explicitly required medical evidence. In *Matter of Guardianship & Conservatorship of Teeter*, 537 N.W.2d 808, 810 (Iowa Ct. App.1995), the court concluded that "[t]he fact [respondent] may spend money foolishly or give money to a child [wa]s not in itself sufficient to find she [wa]s not competent." Although the court noted the absence of medical evidence, it did not hold that such evidence was required. And in *In re Conservatorship of Trout*, No. W200801530COAR3CV, 2009 WL 3321337, at *15 (Tenn.Ct.App. Oct. 15, 2009), the court made no mention of a medical evidence requirement.

¶ 28 Therefore, we conclude that section 15–14–401 does not require medical evidence. To the extent Father asserts alternatively that Son's evidence was otherwise insufficient to satisfy the "clear and convincing" standard, we address and reject that argument below in Part IV.

## III. The Trial Court Did Not Commit Reversible Error by Denying Father's Motion to Enforce the Stipulation

### A. Additional Background

¶ 29 Recall that during the April hearing, the trial court denied Father's motion to enforce the oral stipulation. But the court considered only Father's motion, Son's written opposition, and further argument from counsel. It did not receive any evidence.

¶ 30 Son's counsel brought up conduct by Father at odds with the stipulation. This conduct included using electronic transfers that could not be monitored by the account-

ing firm, as contemplated by the oral stipulation, and setting up at least one bank account without involving that firm, which the oral stipulation required. Father's counsel did not dispute these assertions or seek to elicit testimony from Father to rebut them.

¶ 31 The court did not make any findings concerning material terms on which either the parties had failed to agree or the parties had agreed but were ambiguous. Still, it ruled, "[w]e don't have a stipulation or order yet."

### B. Preservation and Standard of Review

¶ 32 Father preserved this issue in his motion to enforce the stipulation.

¶ 33 Whether parties have entered into a settlement agreement is generally a factual determination, *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1247 (Colo.App.2001), which will be upheld if supported by competent evidence. *City of Boulder v. Farmer's Reservoir & Irrigation Co.*, 214 P.3d 563, 569 (Colo.App.2009). But where "the parties relied solely on the transcript memorializing the settlement discussions, and their dispute was centered not on underlying facts, but on the conclusions to be drawn from that document," because "the trial court's ruling necessarily was based on its interpretation of the written transcript," appellate review is de novo. *DiFrancesco*, 39 P.3d at 1247. An appellate court can affirm a trial court's ruling for any reason supported by the record, even if that reason was not argued to, or addressed by, the trial court. *See Roque v. Allstate Ins. Co.*, 2012 COA 10, ¶ 7, 318 P.3d 1.

### C. Law

¶ 34 "We interpret a settlement agreement using common law contract principles." *Draper v. DeFrenchi–Gordineer*, 282 P.3d 489, 493 (Colo.App.2011). Thus, "for a settlement to be binding and enforceable, there must be a meeting of the minds as to the terms and conditions of the compromise and settlement." *H.W. Houston Constr. Co. v. Dist. Court*, 632 P.2d 563, 565 (Colo.1981) (internal quotation marks omitted). If a court finds that the parties intend-

ed to create a binding settlement agreement, the court must then consider whether the parties agreed on all essential terms. *DiFrancesco*, 39 P.3d at 1248 (No binding agreement exists "if it appears that further negotiations are required to work out important and essential terms."). Whether a term is essential is determined by the parties' intent, "as disclosed upon consideration of all surrounding facts and circumstances." *Am. Min. Co. v. Himrod–Kimball Mines Co.*, 124 Colo. 186, 190, 235 P.2d 804, 807 (1951).

### D. Application

¶ 35 Father contends the trial court erred when it refused to enforce the oral stipulation. Son responds that because "the parties were in disagreement of an essential term of the [s]tipulation," the trial court did not abuse its discretion. We agree with the trial court, but for a different reason.

¶ 36 As for the "terms of the stipulation as dictated into the record," the parties now take predictably opposing views of whether, as of the January hearing, those terms were "clear and unambiguous." *Royal v. Colo. State Pers. Bd.*, 690 P.2d 253, 255 (Colo.App. 1984). Still, "[t]he parties' disagreement over the meaning does not in and of itself create an ambiguity in the contract." *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 950 (Colo.App.2011). We need not decide whether the parties failed to agree on one or more material terms, which would be a question of fact, or agreed on such terms that were fatally ambiguous, which would be a question of law.

¶ 37 At the April hearing, both counsel provided the court with indications that Father had already acted contrary to the terms discussed at the January hearing. Even if the parties had agreed on all material terms, and terms such as "monitor" were unambiguous, in January the parties recognized that if Father acted contrary to the restrictions, either Son or Servis could bring Father before the court during the year covered by the stipulation.

¶ 38 Therefore, even assuming that the court should have found the oral stipulation enforceable, the court still proceeded consistent with that stipulation by holding a hear-

ing on whether to make the conservatorship permanent.

### IV. The Trial Court Did Not Err by Denying Father's Motion for a New Trial

¶ 39 Father contends the trial court abused its discretion when it denied his motion for a new trial. On appeal, Father points out that his motion "set[ ] forth multiple irregularities in the proceedings." But because he provides argument only about the "in camera discussions required by the court" and the court's decision "permitting last minute testimony from a CPA rather than requiring further medical evidence," we decline to address any other alleged irregularities. *See Extreme Constr. Co. v. RCG Glenwood, LLC,* 2012 COA 220, ¶ 26, 310 P.3d 246 (declining to review where party "provides no supporting argument or authority for [a] specific assertion"). As to these issues, we conclude that the trial court did not abuse its discretion.

### A. Preservation and Standard of Review

¶ 40 Father preserved the untimely expert designation issue by moving to strike Taylor, objecting to Taylor's testimony at the May hearing, and renewing this issue in moving for a new trial.

¶ 41 Appellate review of "a trial court's decision on a motion for a new trial under C.R.C.P. 59 [is] for abuse of discretion." *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 608 (Colo.App.2007). The abuse of discretion standard also applies to rulings on expert witness disclosures. *See Warden v. Exempla, Inc.*, 2012 CO 74, ¶ 30, 291 P.3d 30. Thus, our standard of review is the same whether we address the court's initial ruling allowing Taylor to testify or its denial of the new trial motion as to this issue.

¶ 42 Whether Father preserved any issue concerning the discussions in chambers outside of his presence raises a closer question. The earliest objection appears in the new trial motion. *See Denny Constr., Inc. v. City & Cnty. of Denver*, 170 P.3d 733, 740 (Colo. App.2007) (Because defendant did not object at trial or otherwise "raise the issue until

after judgment, when it filed a motion for an amendment of the judgment pursuant to C.R.C.P. 59," it waived issue on appeal.), *rev'd on other grounds,* 199 P.3d 742 (Colo. 2009). Still, because Son does not dispute preservation and error, if any, was harmless, we elect to treat the issue as preserved.

### B. In Chambers Conferences

¶ 43 At both the January and April hearings, the court stopped the proceedings and directed counsel into chambers for discussion, without the parties present. Father argues that doing so was improper and this irregularity denied him a fair trial. As to exactly why, however, his arguments lack clarity.

¶ 44 In his opening brief, Father refers to his motion to recuse the trial judge and the supporting argument. In his reply brief, Father argues more specifically that because the judge told the parties at the January hearing that he believed a protective order was necessary before having heard any evidence, the judge "had to [have] some degree prejudged the case." According to Father, "[w]hatever evidence [he] and his counsel presented, the outcome would not be in [his] favor because some form of control over [his] affairs was already contemplated by the trial court."

¶ 45 But to the extent the court's comments presented a ground for recusal, Father should have moved immediately under C.R.C.P. 97. *See Aaberg v. Dist. Court,* 136 Colo. 525, 529, 319 P.2d 491, 494 (1957) ("[I]f grounds for disqualification are known at the time the suit is filed ..., a motion to disqualify should be filed prior to taking any other steps in the case. Failure to promptly assert known grounds of disqualification ... may well constitute a waiver thereof."). Instead, he participated in the ongoing proceedings before this judge and sought recusal only after a permanent conservator had been appointed. *See People in Interest of*

*A.G.,* 262 P.3d 646, 652 (Colo.2011) ("In particular, Colorado courts have held that when a party knows of grounds for disqualification but waits to file a motion until after an adverse judgment has been issued, the motion is barred by waiver.").

¶ 46 To the extent Father argues that his absence from the discussions in chambers denied him a fair trial, this argument fails for the following reasons:

- Father's counsel did not object to the court conferring with both counsel in chambers.
- Father's counsel did not request that Father be present.
- Because both counsel were present throughout the conferences, no improper ex parte communications occurred.[1] Therefore, we discern no ground for reversal.

### C. Expert Testimony

¶ 47 Father contends that allowing Taylor to testify as an expert, "in lieu of input from a psychologist" and despite the conservatorship statute's "requirement of medical evidence," constituted both an irregularity in the proceeding and an error of law warranting a new trial. Our conclusion that the conservatorship statute does not require medical evidence also forecloses this argument.

¶ 48 Alternatively, Father contends that the "last-minute" nature of Taylor's disclosure "deprived [him] of the right to offer counter evidence, and came as a total surprise in that the requirement of medical evidence was now suddenly ignored." Also, Father argues that "disclosure of Mr. Taylor as an expert witness on the eve of trial violated C.R.C.P. 26(a)(2)."

¶ 49 To begin, we do not condone the late endorsement of witnesses. *See Daniels v. Rapco Foam, Inc.,* 762 P.2d 717, 719 (Colo.

---

1. Even if Father's absence from the conferences in chambers could have due process implications, because he does not raise this argument on appeal, we decline to address it. *See Mountain States Beet Growers' Mktg. Ass'n v. Monroe,* 84 Colo. 300, 308, 269 P. 886, 888 (1928) ("It is the general rule and practice, both in the federal and state courts, not to pass upon constitutional questions, unless it is essential to the disposition of the pending cause."). But avoiding discussions of the merits in chambers that are both off the record and in the parties' absence would eliminate due process and other challenges to the decision based on a party's absence.

App.1988). And the trial court's allowing Taylor to testify, without making findings concerning either any excuse for Son's untimely disclosure or prejudice to Father, as required under *Todd v. Bear Valley Village Apartments,* 980 P.2d 973, 978 (Colo.1999), is troubling. Still, these irregularities do not require reversal because Father's counsel failed to request a continuance.

¶ 50 The failure to disclose an expert witness "in a timely fashion" may prejudice the opposing party "by denying that party an adequate opportunity to defend against the evidence."

¶ 51 *Id.* at 979. Prejudice was more likely here because, based on the trial court's prior order, Father's counsel may have been expecting expert testimony from a psychologist but had no reason to anticipate such testimony from a CPA.

¶ 52 Even so, "[a]bsent a request for an extension or continuance, we find no prejudice and no error." *Newell v. Engel,* 899 P.2d 273, 277 (Colo.App.1994). Thus, because Father did not request a continuance, either when moving to strike the witness or at the hearing, the decision allowing Taylor to testify—even if erroneous—does not warrant reversal. *Id.*[2]

### D. Insufficient Evidence

 ¶ 53 Finally, we consider Father's argument that Son did not meet his burden of producing "clear and convincing evidence" that Father was "unable to effectively receive or evaluate information or both or to make or communicate decisions." But we view his argument through the lens of our conclusions that the conservatorship statute does not require medical evidence and the trial court did not reversibly err by admitting Taylor's testimony.

#### 1. Standard of Review

¶ 54 "It is the responsibility of the trier of fact to determine the credibility of the wit-

nesses, the weight, probative effect and sufficiency of the evidence." *Wright Farms, Inc. v. Weninger,* 669 P.2d 1054, 1056 (Colo.App. 1983). Thus, "[o]n appeal, the factual findings of the trial court sitting without a jury are not to be disturbed unless clearly erroneous and not supported by the record." *In re Marriage of Hoffman,* 650 P.2d 1344, 1345 (Colo.App.1982). In such cases, appellate courts are "obligated to search the record for evidence to support the findings of fact." *Bockstiegel v. Bd. of Cnty. Comm'rs,* 97 P.3d 324, 328 (Colo.App.2004).

#### 2. Law

¶ 55 As discussed above, the conservatorship statute required Son to show by "clear and convincing evidence" that Father was "unable to manage property and business affairs because [he] [wa]s unable to effectively receive or evaluate information or both or to make or communicate decisions." § 15–14–401(1)(b)(I).

#### 3. Application

¶ 56 The trial court heard testimony from Taylor, Dr. Kaye, and Father.

¶ 57 Taylor's admission that he lacked medical expertise is potentially problematic. Under section 15–14–406.5(1), "[i]f the court orders [an] evaluation, the respondent must be examined by a physician, psychologist, *or other individual* appointed by the court who is qualified to evaluate the respondent's alleged impairment." (Emphasis added.)

 ¶ 58 According to the "well-worn canon of statutory construction *noscitur a sociis,* a word may be known by the company it keeps." *St. Vrain Valley Sch. Dist. RE–1J v. A.R.L.,* 2014 CO 33, ¶ 22, 325 P.3d 1014 (internal quotation marks omitted). This canon suggests that any such "other individual" should have had medical expertise. In any event, contrary to the requirements of section 15–14–406.5, Taylor never met with

---

**2.** Father correctly points out that a continuance would have disadvantaged him by extending the special conservatorship pending further proceedings. But because numerous criminal cases—where continued incarceration makes the consequences much more severe—turn on failure to

have sought a continuance, we conclude that the rule applies here with equal force. *See, e.g., Gorum v. People,* 137 Colo. 1, 2–3, 320 P.2d 340, 341 (1958); *People v. Kraemer,* 795 P.2d 1371, 1375 (Colo.App.1990).

Father. For these reasons, we give little weight to Taylor's testimony.

¶ 59 The primary medical expert evidence came from Dr. Kaye, who testified that Father did not meet the standard for appointment of a conservator. However, Dr. Kaye testified that she was not aware of the details surrounding Father's offshore transactions—because she was not asked to review documents describing the alleged e-mail scams. Thus, the court could have concluded that her opinion lacked a sufficient factual basis. Also, because her report used the term "incapacitated," rather than the applicable standard under the conservatorship statute, the court may have concluded that her opinion lacked credibility, despite her testimony that she actually applied the correct standard.

¶ 60 The trial court accepted a letter that Father offered from Sandra Chelist, a therapist who, over several years, had treated him for depression and anxiety. She wrote that "[a]t no time during his treatment did he present as incapacitated in any manner," and that she "would consider his ability to communicate his thoughts and process abstract emotional material as excellent." She testified to Father's "high degree of cognitive functioning through the course of his treatment and therapy," and she "had no concerns" leading her "to think the conservatorship or guardianship were in order." However, when questioned whether he "ever discuss[ed] how he was managing his property or his business affairs," she responded, "[o]nly in passing," explaining that "[i]t was not something that [they] discussed at length." Thus, like Dr. Kaye, the court could have discounted her opinion because she did not consider Father's financial management.

¶ 61 But even if all of the properly admitted expert testimony favored Father, the trial court was not bound to accept expert testimony. *Cooper Invs. v. Conger*, 775 P.2d 76, 81 (Colo.App. 1989) (trial court not bound to accept expert testimony about fair market value of collateral "even though it was undis-

puted"). Therefore, we turn to other evidence before the court, and conclude that this evidence shows the court's findings supporting its appointment of a receiver were not clearly erroneous.

¶ 62 Son presented uncontroverted evidence of the offshore transfers, totaling almost $500,000. In a letter to the court, Father explained that he had "involvement in several international alternative energy research settings." He added that "$155,000 went directly to research expenses," and "$302,000 went not to scams, but to international funding activities that were initiated by others because of interest in [his] research." Yet, at the May hearing, he asserted his Fifth Amendment privilege and refused to discuss his "international work."

¶ 63 To be sure, section 15–14–401 precludes imposing a conservatorship on the sole basis of imprudent investments. But the court could have concluded that Father had fallen prey to obvious fraud.[3] And from Father's repeated participation in similarly suspicious transactions, the court could have reasonably inferred that Father was "unable to manage property and business affairs because [he] [wa]s unable to effectively receive or evaluate information or both." § 15–14–401(1)(b)(I).

¶ 64 Father's letter to the court strengthens this inference because he did not explain why he continued taking out loans and wiring money to bank accounts that Taylor described as "nameless" and "faceless," based on unsolicited proposals from sources that he had done nothing to verify by determining the transferee's identity, finding out exactly how the money would be used, or otherwise evaluating the validity of the proposed transaction. As well, in a civil case, the finder of fact may draw an adverse inference from assertion of the Fifth Amendment privilege. *See Asplin v. Mueller*, 687 P.2d 1329, 1332 (Colo.App.1984) (collecting cases); *see also Matter of Estate of Trogdon*, 330 N.C. 143, 409 S.E.2d 897, 902 (1991) ("[T]he finder of fact in a civil cause may use a

---

3. For example, one of the alleged scams involved someone who claimed he knew a person from Afghanistan who had over $20 million in a bank account but had died in a roadside bombing. The solicitor told Father that he could recover the money if Father transferred a significantly smaller sum of money overseas and claimed a relationship to the decedent.

witness' invocation of his fifth amendment privilege against self-incrimination to infer that his truthful testimony would have been unfavorable to him."); *Flournoy v. Wilz*, 201 S.W.3d 833, 838 (Tex.Ct.App.2006) ("Rather, as civil litigants, the Flournoys' assertions of the Fifth Amendment and refusals to testify gave rise to the adverse inference, or presumption, that they sought to conceal unfavorable evidence."), *rev'd on other grounds*, 228 S.W.3d 674 (Tex.2007).

¶ 65 Therefore, because "[o]ur review of the record here reveals sufficient evidence to support the trial court's determination," we will not disturb the court's ruling. *Wright Farms*, 669 P.2d at 1056.

### E. Cumulative Error

¶ 66 Father cites no authority applying the cumulative error doctrine in a civil case. Although the doctrine finds frequent mention in criminal decisions of our supreme court and divisions of this court, we decline to extend it to civil cases. *Compare Baxter v. Archie Cochrane Motors, Inc.*, 271 Mont. 286, 895 P.2d 631, 633 (1995) ("To date, this Court has applied the doctrine of cumulative error exclusively in criminal cases. We decline to extend it to civil cases based on the facts of this case."), *with Estis Trucking Co.,*

*Inc. v. Hammond*, 387 So.2d 768, 773 (Ala. 1980) ("Although the cumulative error doctrine announced in Blue was there applied in a criminal case, it is equally applicable in civil cases."). Such a significant expansion of precedent—which very few jurisdictions have done—is more properly the province of our supreme court. *See State v. Byers*, 554 N.W.2d 744, 749 (Minn.Ct.App.1996) ("We decline the invitation to extend the existing law, while recognizing that there may be merit to the suggestion, because we consider it more appropriately the province of the supreme court.").

### V. Conclusion

¶ 67 The orders appointing a permanent conservator over Father's estate and denying his motion for a new trial are affirmed.

Judge GRAHAM and Judge TERRY concur.