24CA1282 Marriage of Skellchock 10-23-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1282
Larimer County District Court No. 18DR30326
Honorable Juan G. Villaseñor, Judge
Honorable Susan Blanco, Judge

---

In re the Marriage of

Derek Skellchock,

Appellant,

and

Alora-Ann Paige Volz,

Appellee.

---

ORDERS AFFIRMED

Division A
Opinion by CHIEF JUDGE ROMÁN
Bernard* and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 23, 2025

---

Derek Skellchock, Pro Se

No Appearance for Appellee

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Derek Skellchock (father) appeals the district court's order modifying parental responsibilities and child support. Father also appeals the court's order denying his C.R.C.P. 60(b)(3) motion to set aside orders issued by Eighth Judicial District Court Chief Judge Susan Blanco after January 2020. We affirm.

## I. Parental Responsibilities

¶ 2     Father contends that the court's order modifying parental responsibilities must be reversed because the court erred by (1) not continuing the modification hearing when father presented the court with purported improprieties in the investigation by the child and family investigator (CFI) and (2) drawing a negative inference against father when he did not release information on his physical and mental health. We consider and reject his contentions.

### A. Relevant Facts

¶ 3     In 2020, the district court dissolved father's marriage with Alora-Ann Paige Volz (mother) and directed them to exercise equal parenting time with their child. The court allocated to mother sole decision-making responsibility for medical, educational, and religious decisions. It allocated to father sole decision-making responsibility for extracurricular activities.

1

¶ 4　　After a division of this court affirmed the permanent orders, *see In re Marriage of Skellchock*, (Colo. App. No. 21CA0503, Feb. 24, 2022) (not published pursuant to C.A.R. 35(e)), father asked the court to modify parental responsibilities by increasing his parenting time and allocating to him educational and medical decision-making responsibility.  Mother also asked the court to modify parental responsibilities, seeking to increase her parenting time and receive decision-making responsibility for the child's extracurricular activities.

¶ 5　　At a status conference on December 19, 2023, the court appointed a CFI and reset the modification hearing for March 22, 2024.  In its written order, issued the same day, the court indicated that the CFI's report was due three days later.  The day after the status conference, the CFI filed a status report informing the parties that because the hearing was reset for March 22, 2024, she would "file her report by no later than March 1, 2024."  The CFI also emailed the parties and informed them of this updated due date.

¶ 6　　On March 1, 2024, the CFI filed her report.  The CFI reported that she received limited information from father.  She explained that she ended father's interview, which occurred on February 12,

2

2024, because he refused her repeated requests to stop recording it. She also explained that father did not comply with her requests for information and that she believed he purposefully interfered with the investigation and tried to intimidate or manipulate her. The CFI reported that, by contrast, mother fully participated in the investigation. Based on her investigation, the CFI recommended that the child reside primarily with mother.

¶ 7 About a week later, father filed a motion to continue the modification hearing, raising concerns about the CFI's investigation and the timing of her report, and he asked for more time to secure an expert to review the CFI's report and collect evidence to rebut her recommendation. The court denied the motion.

¶ 8 Then, after a full-day hearing, the court issued a thorough and detailed order modifying parental responsibilities. The court increased mother's parenting time, directing that, during the school year, the child would reside primarily with her and father may have overnight visits every other weekend. The court further ordered that, during the summer months, the parties would exercise equal parenting time. In support of its decision, the court found that

3

mother placed the child's best interests ahead of her own and lived close to the child's school.  By contrast, it found that father had

- recently moved to a new home, which was about a forty-five-minute drive away from the child's school;

- verbally abused mother, knowingly ignoring court orders prohibiting such behavior;

- engaged in "manipulative and controlling" conduct and attempted to "manipulate these proceedings";

- made "vindictive" decisions to exclude mother from the child, tried to create a wedge between mother and the child, and used the child to "play games" with mother;

- not placed the child's needs ahead of his own due to his "anger toward and negative views of [m]other"; and

- "fail[ed] to act in the child's best interests in fundamental ways."

¶ 9    The court also modified decision-making responsibility, allocating to mother sole authority over extracurricular activities. The court explained that father

- "bull[ied]" mother, treated her "disrespectfully, oftentimes without provocation," and "antagonize[d] virtually every situation";

- would not communicate with mother in a respectful manner;

- repeatedly "disregard[ed] [mother's] authority and ma[d]e decisions without her" in violation of the court's permanent orders; and

- abused his limited decision-making authority "to wring additional parenting time to the detriment of the child's best interests."

¶ 10    Father filed a C.R.C.P. 59 motion for post-trial relief, asserting irregularities in the proceedings. The court denied the motion.

## B.    Governing Legal Standards

¶ 11    As relevant here, a court may modify the allocation of parental responsibilities to serve the child's best interests. *See* § 14-10-129(1)(a)(I), C.R.S. 2025 (parenting time); § 14-10-131(2), C.R.S. 2025 (decision-making responsibility).

¶ 12    The court has broad discretion when determining whether to modify parental responsibilities, and, like all parental orders, we

must exercise every presumption in favor of affirming its ruling. *In re Parental Responsibilities Concerning S.Z.S.*, 2022 COA 105, ¶ 13. We therefore will not disturb the court's decision absent a showing that the court abused its discretion, meaning that it misapplied the law or that its decision was manifestly arbitrary, unreasonable, or unfair. *In re Marriage of Collins*, 2023 COA 116M, ¶ 8.

      C.    The Motion to Continue and the CFI's Investigation

¶ 13    In his motion to continue, father asserted, as relevant here, that he had "several concerns with the CFI Report, most notably" the CFI excluding him from the investigation. He also argued that the CFI violated Chief Justice Directive 04-08 by submitting her report only twenty-one days before the hearing and that he was not left with enough time to hire an expert to review the CFI's investigation and report. *See* Chief Justice Directive 04-08, Directive Concerning Court Appointments of Child and Family Investigators Pursuant to Section 14-10-116.5, C.R.S., § VIII(C), standard 10 (amended Aug. 2024) ("If the court order does not specify the due date, the report is timely if filed at least 35 days before the trial or hearing.") (CJD 04-08).

¶ 14    The court found that father did not establish good cause to continue the hearing.  The court acknowledged that, since it incorrectly set the CFI's report's due date for three days after it appointed the CFI, the report was due February 16, 2024 (thirty-five days before the hearing), under CJD 04-08.  *See id.*  However, the court found that, in December 2023, father was informed that the CFI would not complete her report until March 1, 2024, and that father raised no objection to that completion date until after the report was submitted.

¶ 15    The court also rejected father's claim that the CFI did not allow him to participate in the investigation.  The court found that father refused to adhere to the CFI's repeated requests to stop recording their interview and that he did not provide the CFI with the information she requested.  It then found that father had the opportunity to participate but he chose not to do so.  The court further found that while father claimed that he was unable to secure an expert to complete a work product review before the hearing, father gave no information about a timeframe by which an expert could provide an opinion.  Additionally, the court said that to properly challenge the CFI's opinions, father should have asked for

7

the appointment of a parental responsibilities evaluator (PRE), but he did not do so.

¶ 16 A court should grant a motion to continue only when the moving party shows good cause, meaning that "there are unforeseen and exceptional circumstances requiring a continuance." *Miller v. Brannon*, 207 P.3d 923, 932 (Colo. App. 2009); *see* C.R.C.P. 121, § 1-11. We will not disturb the court's decision unless the court abused its discretion. *People in Interest of E.B.*, 2022 CO 55, ¶ 14. In determining whether the court abused its discretion, we consider "the total circumstances as reflected by the record," *People v. Wells*, 776 P.2d 386, 389 (Colo. 1989), and even if the court abused its discretion, "reversal is not warranted unless a party demonstrates actual prejudice," *Black v. Black*, 2018 COA 7, ¶ 107.

¶ 17 Father begins by arguing that the court incorrectly found that he knew the CFI's report would not be filed until March 1, 2024, claiming that her status report was not sent to him. Even if we assume that father did not receive the status report, the record reveals that he received the CFI's December 19, 2023, email informing him that her report would be completed by March 1, and

he raised no objection to that timing until he filed his motion to continue. Moreover, the court found, with record support, that father's attorney entered an appearance on February 16, 2024 — the same day of the default deadline under CJD 04-08 and a few days after the CFI ended her interview with father. *See* CJD 04-08, § VIII(C), standard 10. The court therefore acted within its discretion by finding that the March 1, 2024, filing of the CFI report did not establish good cause for continuing the hearing. *See E.B.*, ¶ 14; *Miller*, 207 P.3d at 932.

¶ 18 Father next argues that he had the right to record his interview with the CFI and thus the court erred by finding that he did not participate in the CFI investigation by refusing to stop recording the CFI's interview. Father acknowledges that nothing in Colorado establishes a legal right to record the interview with the CFI. Instead, he relies on two cases from New Jersey. *See Koch v. Koch*, 38 A.3d 703, 709 (N.J. Super. Ct. Ch. Div. 2011); *B.D. v. Carley*, 704 A.2d 979, 981 (N.J. Super. Ct. App. Div. 1998). These out-of-state cases are not binding on this court or the district court. *See Johnson v. Staab*, 2025 COA 45, ¶ 31. But even if we assume, without deciding, that the CFI improperly ended her interview with

father based on his recording, his refusal to end the recording was not the sole basis supporting the court's finding that father chose not to participate in the CFI's investigation. The CFI also reported that, before the interview, father did not (1) release his medical information; (2) complete the CFI's questionnaire; or (3) sign paperwork requested by the CFI. The CFI further reported that she believed father purposefully tried to interfere with her investigation and intimidate or manipulate her. Therefore, even in the absence of father's refusal to end his recording of the interview, the record supports the court's finding that he did not participate in the CFI's investigation. *See Wells*, 776 P.2d at 389; *Black*, ¶ 107; *see also* C.A.R. 35(c) (directing the court to disregard any error or defect that does not affect the parties' substantial rights); *People in Interest of A.C.*, 170 P.3d 844, 845 (Colo. App. 2007) (concluding that an alleged error, without a valid allegation of prejudice, is not grounds for reversal).

¶ 19 Father also makes the conclusory claim that the "court violated [his] rights under the Americans with Disabilities Act," asserting that his "hearing or memory disabilities" justified recording the interview. *See* 42 U.S.C. §§ 12131-12134. Father

10

neither raised this issue with the district court nor asked for permission to record the interview as an accommodation under the Americans with Disabilities Act. *See In re Marriage of Ensminger*, 209 P.3d 1163, 1167 (Colo. App. 2008) ("Arguments not presented at trial cannot be raised for the first time on appeal."). Nor does he develop any meaningful legal argument in support of this claim on appeal. *See In re Marriage of Drexler*, 2013 COA 43, ¶ 27 (declining to address an undeveloped argument). We therefore will not address it further.

¶ 20 Father next challenges the court's statement that he needed to request a PRE evaluation to properly challenge the CFI's report. But even if we assume that this one statement was unwarranted, father does not show that, under the totality of circumstances, the court's determination that father failed to establish good cause for continuing the hearing warrants reversal. *See Wells*, 776 P.2d at 389; *Black*, ¶ 107; *see also* C.A.R. 35(c); *A.C.*, 170 P.3d at 845. Beyond the court's reference to a PRE, the court explained that, before March 2024, father knew of the timing of the CFI's report and was aware of his concerns with the CFI investigation, but that he did not ask to continue the hearing until a week after the CFI

filed her report and two weeks before the hearing. As well, the court highlighted that father provided no information about a timeframe for obtaining an expert to conduct his desired work product review, and father did not describe any efforts he took to hire such an expert. The court's findings, supported by the record, amply support its determination declining to continue the hearing.

¶ 21 Father further claims that continuing the hearing and allowing him to obtain a work product review would have shown that, in addition to the delayed report filing, the CFI violated other standards set forth in CJD 04-08, including standards 1, 2, 8, and 18. *See* CJD 04-08, § VIII(A), (C), (D). But father did not raise any of these issues with the district court until after the court denied his motion to continue and modified parental responsibilities. *See Briargate at Seventeenth Ave. Owners Ass'n v. Nelson*, 2021 COA 78M, ¶ 66 ("Arguments made . . . for the first time in a post-trial motion are too late and, consequently, are deemed waived for purposes of appeal."); *see also People v. Schaufele*, 2014 CO 43, ¶ 49 (Boatright, J., concurring in the judgment) ("Motions for reconsideration are designed to correct erroneous court rulings; they are not designed to allow parties to present new legal

arguments for the first time and then appeal their denial . . . .").
Moreover, it is the role of the district court to apply the applicable
legal standards and weigh the recommendations of a CFI, along
with all evidence, to decide whether to modify parental
responsibilities. *See In re Parental Responsibilities Concerning B.J.*,
242 P.3d 1128, 1133 (Colo. 2010); *see also In re Marriage of
McNamara*, 962 P.2d 330, 334 (Colo. App. 1998) (recognizing that
the court is not required to follow the recommendation of the
evaluator and may reach its own conclusions concerning the child's
best interests). At the hearing, even though father did not directly
mention the CJD 04-08 standards, he questioned the CFI and
challenged her recommendation due to purported inadequacies with
her investigation. The court weighed father's complaints and
determined, with record support, that modifying parental
responsibilities served the child's best interests. *See Collins*, ¶ 8;
*S.Z.S.*, ¶ 13.

¶ 22    The court therefore acted within its discretion by denying
father's motion to continue the hearing.

D. Father's Physical and Mental Health Information

¶ 23    Father next argues that the district court abused its discretion by drawing a negative inference against him when he declined to release his physical or mental health information, claiming that it was protected by the physician-patient privilege. We are unpersuaded.

¶ 24    In her report, the CFI said that she learned father had post-traumatic stress disorder and physical disabilities. She said that she sent father a questionnaire and asked him for information about his physical and mental health conditions and treatment, but that he did not provide that information. The CFI also reported that father refused to sign a release for his physical and mental health information, claimed the information was not relevant, and said that the release "violated HIPAA."

¶ 25    At the hearing, father again said that his physical and mental health information was not relevant. The court corrected him and asked him to describe his physical and mental health conditions. *See* § 14-10-124(1.5)(a)(V), C.R.S. 2025 (providing that the mental and physical health of all individuals involved is a relevant factor to consider in determining the best interests of the child). In

14

response, father listed multiple physical impairments and reported a diagnosis for post-traumatic stress disorder.

¶ 26    When the court later modified parental responsibilities, it found that father had "significant mental-health concerns that directly affect[ed] his ability to act in the child's best interests." The court also found that father reported various physical and mental health conditions but that he refused to identify those conditions with the CFI, would not sign a release for his medical information, and was evasive when questioned about his health.

¶ 27    Father filed a motion for post-trial relief under C.R.C.P. 59. He argued that his physical and mental health information was protected by the "doctor-patient privilege" and that when he asserted this privilege, the court (and the CFI) improperly used his nondisclosure against him. The court denied the C.R.C.P. 59 motion and found that "there's nothing irregular about weighing evidence that [father] engaged in efforts to conceal the nature and extent of his medical and psychological conditions — which are directly relevant to the best interest's factors — by failing to provide basic information about the same." The court further explained that it had sole discretion to determine the credibility of witnesses

and the weight to give to the evidence, and it explained that it exercised that discretion when it considered father's evasive conduct. The court added, "While [father] remains free not to waive his physician-patient privilege, that choice — in a civil case — comes with consequences and the [c]ourt remains free to make adverse inferences regarding that choice."

¶ 28 The physician-patient privilege protects a physician's disclosure of a patient's "information acquired in attending the patient that was necessary to enable him or her to prescribe or act for the patient" without the patient's consent. § 13-90-107(1)(d), C.R.S. 2025; *see also* § 13-90-107(1)(g) (describing the similar privilege for therapeutic information acquired by a mental health provider). The "privilege is not a blanket protection against the disclosure of any and all medical information." *Hartmann v. Nordin*, 147 P.3d 43, 49 (Colo. 2006). The court narrowly construes the privilege, and it is the burden of the party asserting the privilege to establish that it applies. *Id.*

¶ 29 Father does not direct us to anything in the record before the court entered its order modifying parental responsibilities where he justified withholding his physical and mental health information

16

because it was privileged information. To be sure, the CFI mentioned that father claimed a violation of "HIPAA" (presumably, the Health Insurance Portability and Accountability Act, *see* Pub. L. No. 104-191, 110 Stat. 1936 (Aug. 21, 1996)), but father never expanded on this generic reference or connected it to the physician-patient or therapist-patient privilege. *See* § 13-90-107(1)(d), (g). Moreover, when the court directly questioned father about his physical and mental health, father responded to the court's questions and never asserted that the information was protected by any privilege. Therefore, father did not establish that a privilege applied to his physical or mental health information before the court ruled on the motions to modify parental responsibilities. *See Hartmann*, 147 P.3d at 49.

¶ 30    Still, father highlights that, in his C.R.C.P. 59 motion, he asserted that the physician-patient privilege applied to his physical or mental health information and that, in the court's order denying that motion, it said that it could make an adverse inference against him for declining to waive the privilege. Father argues that the court improperly used that inference to make assumptions about his health and that no legal authority permitted the court to do so.

While the court mentioned that it may make an adverse inference, it is unclear from the ruling whether the court drew such an inference against father when it modified parental responsibilities. But even if it did, the court in a dissolution case generally may draw an adverse inference against a party who failed to disclose relevant information. *See In re Marriage of Sgarlatti*, 801 P.2d 18, 19 (Colo. 1990); *cf. Neher v. Neher*, 2015 COA 103, ¶ 64 (acknowledging that "in a civil case, the finder of fact may draw an adverse inference from assertion of the Fifth Amendment privilege"). Although father disagrees, he does not direct us to any specific legal authority that prohibited the court from drawing an adverse inference against him here. *See Drexler*, ¶ 27 (recognizing the appellant's burden to provide supporting legal authority for contentions of error).

¶ 31 The court then weighed the evidence and the surrounding circumstances, including father's lack of disclosure. It found that father tried to (1) conceal "basic information" about his physical and mental health and (2) downplay his symptoms to the court. *See In re Marriage of Thorburn*, 2022 COA 80, ¶ 49 (acknowledging the court's discretion to weigh conflicting evidence and determine the credibility of the witnesses). The record supports those findings,

18

and the court therefore acted within its discretion by modifying parental responsibilities. *See Collins*, ¶ 8; *S.Z.S.*, ¶ 13.

## II.    Child Support

¶ 32    We next reject father's contention that the court incorrectly determined mother's income for purposes of modifying child support.

### A.    Relevant Facts

¶ 33    Father was obligated to pay child support in the amount of $200 per month. A division of this court affirmed that ruling. *In re Marriage of Skellchock,* (Colo. App. Nos. 22CA0249 & 22CA0250, Oct. 13, 2022) (not published pursuant to C.A.R. 35(e)).

¶ 34    Related to the present proceedings, the parties asked the court to modify child support if it modified parenting time. Father also argued that changes to mother's employment warranted modifying child support.

¶ 35    After the hearing, the court found that mother was unable to return to her prior career as a welder due to a serious workplace injury. It found that she had been working in the restaurant industry as a bartender and recently quit that job, and it noted that she was studying to earn her certification as a welding inspector.

The court determined that mother was voluntarily unemployed, and it imputed to her a potential monthly income of $2,499, which was the income she could earn at a full-time job paying minimum wage — $14.42 per hour.

¶ 36     The court also found that father's monthly income was $3,980, which represented his veteran's disability benefits.  It then calculated that father's modified child support obligation was $497 per month.

B.     Governing Legal Standards

¶ 37     We review a court's child support order for abuse of discretion. *In re Marriage of Garrett*, 2018 COA 154, ¶ 8.

¶ 38     To calculate child support, the court generally uses the parties' actual gross incomes.  § 14-10-115(1)(b)(I), (3)(a)(I), (3)(c), (7), C.R.S. 2025.  But if the court determines that a parent is voluntarily unemployed, the court calculates child support based on that parent's potential income.  § 14-10-115(5)(b)(I); *see People v. Martinez*, 70 P.3d 474, 477 (Colo. 2003).  Potential income is the income a party could earn from a full-time job commensurate with their demonstrated earning ability.  *In re Marriage of Tooker*, 2019 COA 83, ¶ 26.

¶ 39 We defer to the court's income finding unless the record does not support it. *Id.* at ¶ 27; *see also Martinez*, 70 P.3d at 480 (noting that the court's decision on a party's potential income "is typically a question of fact" entitled to deference on review).

## C. Mother's Income

¶ 40 Father agrees with the court's finding that mother was voluntarily unemployed, but he argues that her previous work experience showed that she could earn more than minimum wage. He highlights two January 2024 paystubs, in which her earnings were equivalent to wages of $31.60 per hour and $28.85 per hour.

¶ 41 However, the court found that father was "[c]herry-picking" two pages from mother's paystubs, and it explained that it "considered all the evidence" when determining that the proper potential income for mother was $2,499 per month. The court further explained that, during the last three years that mother worked in the restaurant industry, her annual earnings were less than a full-time minimum wage job. It also found that, presently, it was difficult for mother to work full time because she was studying to take the welding inspector exam.

¶ 42    The record supports the court's findings, and we therefore will not disturb its income determination.  *See Tooker*, ¶ 27; *see also* § 14-10-115(5)(b.5)(II) (directing the court to consider the party's specific circumstances when determining potential income).  Mother testified that, in her last job as a bartender, she was paid $10.63 per hour.  Mother acknowledged that she also received tips, but she reported that, during the last three years working in the restaurant industry, her total annual gross income was $22,740 in 2021, $18,881 in 2022, and $22,742 in 2023 — all less than the approximately $30,000 annual income imputed to mother based on a full-time minimum wage job.  In addition, the two paystubs highlighted by father merely revealed that, during that time, mother's total monthly earnings were approximately $2,500 and equivalent to the income imputed to her.  (In the first bi-weekly pay period, she earned $1,224 for working 38.75 hours, and in the second, she earned $1,299 for working 45.05 hours.)  Moreover, mother described the severe physical injuries she sustained as a welder, and she testified that studying for the welding inspector exam was "intense" and impacted her ability to work full time.

¶ 43    The court therefore did not err by determining that mother's potential monthly income for purposes of child support was $2,499.

### III.    C.R.C.P. 60(b)(3) Order

¶ 44    In addition to the motions to modify parental responsibilities and child support, father filed a C.R.C.P. 60(b)(3) motion to set aside orders issued by Judge Blanco after January 2020.  The district court denied that motion, and father appeals that ruling.  He contends that Judge Blanco recused from the case in January 2020 and that she lacked jurisdiction to issue the later orders.  *See Beckord v. Dist. Ct.*, 698 P.2d 1323, 1330 (Colo. 1985).

¶ 45    However, another division of this court recently rejected father's contention that Judge Blanco's post-January 2020 orders were void.  *In re Marriage of Skellchock*, (Colo. App. No. 23CA1178, July 17, 2025) (not published pursuant to C.A.R. 35(e)).  The division explained that father's actions after January 2020 waived his claim that Judge Blanco lacked authority to rule on his motions.  *Id.* at ¶¶ 12-16; *see People v. Garcia*, 2024 CO 41M, ¶¶ 45-46, 53 (recognizing that a party can waive their claim that a judge acted without authority); *Aaberg v. Dist. Ct.*, 319 P.2d 491, 493-94 (Colo. 1957) (same).  We see no reason to depart from that

23

division's rationale, and we therefore affirm the court's order denying father's C.R.C.P. 60(b)(3) motion.

¶ 46 To the extent father also suggests that orders issued by District Court Magistrate Kandace Majoros were void, he develops no factual or legal argument to support that suggestion. We thus decline to address it. *See Drexler*, ¶ 27.

## IV. Disposition

¶ 47 We affirm the court's orders.

JUDGE BERNARD and JUDGE BERGER concur.